IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| Angela Pickard, Individually and as Executor of the Estate of Archie Pickard, deceased, Dustin Pickard, Wendy Elmore, Joni Thompson and Wayne Pickard, *Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 5:20-CV-01448 |
| v. | §<br>§ | JUDGE DAVID JOSEPH |
| Amazon.com, Inc.; Amazon.com, LLC; Amazon.com Services LLC; Amazon.com Services LLC formerly known as Amazon.com Services, Inc.; Amazon.com Services, Inc.; Amazon.com Services, Inc. formerly known as Amazon Fulfillment Services, Inc.; Amazon Fulfillment Services, Inc.; and Amazon.com Sales, Inc., *Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | TRIAL BY JURY REQUESTED |

### MEMORANDUM IN SUPPORT OF
### PLAINTIFFS' RESPONSE TO AMAZON'S MOTION FOR SUMMARY JUDGMENT

MITHOFF LAW

RICHARD WARREN MITHOFF
Admitted Pro Hac Vice
rmithoff@mithofflaw.com
JANIE L. JORDAN
Admitted Pro Hac Vice
jjordan@mithofflaw.com
Penthouse, One Allen Center
500 Dallas, Suite 3450
Houston, Texas 77002
Telephone: 713-654-1122
Facsimile: 713-739-8085

CHARLES E. TABOR
ATTORNEY AT LAW, LLC

CHARLES E. TABOR
LA Bar Roll No. 31984
Charles@charlestaborlaw.com
670 Albemarle Dr. Set 301
Shreveport, LA 71106
Tel: (318) 963-0953
Fax: (318) 582-1245

BECK REDDEN LLP

NICHOLAS M. BRUNO
Admitted Pro Hac Vice
nbruno@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... iii

Summary Judgment Evidence ............................................................................ vi

Introduction .......................................................................................................... 1

Factual Background ............................................................................................. 2

Standard of Review ............................................................................................. 4

Argument .............................................................................................................. 4

    I.    Amazon is liable under the Louisiana Products Liability Act as a "manufacturer." ................................................................................. 4

        A.    Amazon is in the business of distributing the product for resale. ............... 5

        B.    Amazon is the alter ego of the manufacturer. ............................................. 7

            1.    Amazon "is affiliated with" Jisell "by way of . . . control." ........... 8

            2.    Amazon "assumes or administers product warranty obligations of the alien manufacturer." ........................................ 11

            3.    Amazon "prepares or modifies the product for distribution." .................................................................................. 12

    II.    Plaintiffs assert a viable alternative non-manufacturing seller liability claim. ................................................................................................ 13

        A.    Amazon is a seller. ..................................................................................... 13

        B.    Amazon knew, or should have known, of the battery charger's defects. ........................................................................................................ 15

    III.    Amazon negligently performed its undertaking regarding product safety. .......... 18

        A.    Amazon assumed a duty regarding product safety. ................................... 18

            1.    Amazon promised to investigate unsafe products. ....................... 19

            2.    Amazon promised to take appropriate remedial action. .............. 21

            3.    Amazon's arguments do not warrant summary judgment on this part of the negligent undertaking test. .................................... 22

        B.      Mr. Pickard relied upon Amazon's undertaking. ..................................... 24

Conclusion and Prayer ............................................................................... 25

Certificate of Service ................................................................................. 26

TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Alexander v. Toyota Motor Sales*,
    123 So. 3d 712 (La. 2013) ...................................................................................15

*Barnes v. Dresser, LLC*,
    No. 1:21-CV-00024, 2024 WL 3831141 (W.D. La. Aug. 14, 2024).....................................18

*Bolger v. Amazon.com, LLC*,
    267 Cal. Rptr. 3d 601 (Cal. App. 2020)..............................................................10

*Boykin v. La. Transit*,
    707 So.2d 1225 (La. 1998*)* ...............................................................................14

*Bujol v. Entergy Services, Inc.*,
    922 So. 2d 1113 (La. 2006) ...............................................................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................4

*Doe v. McKesson*,
    339 So.2d 524 (La. 2022) ...................................................................................14

*Fox v. Amazon.com, Inc.*,
    930 F.3d 415 (6th Cir. 2019) ...................................................................22, 25

*Good v. Ohio Edison Co.*,
    149 F.3d 413 (6th Cir. 1998) ............................................................................25

*Harken Expl. Co. v. Sphere Drake Ins. PLC*,
    261 F.3d 466 (5th Cir. 2001) ............................................................................14

*Hebert v. Rapides Par. Police Jury*,
    974 So. 2d 635 (La. 2008) .................................................................................24

*M. S. v. Amazon.com, Inc.*,
    No. 3:23-CV-0046, 2023 WL 8283642 (S.D.W. Va. Nov. 30, 2023) ..............................9, 25

*Media Prod. Consultants, Inc. v. Mercedes-Benz of N. Am., Inc.*,
    262 So.2d 377 (La. 1972) ...................................................................................7

*Oberdorf v. Amazon.com Inc.*,
    930 F.3d 136 (3d Cir. 2019),
    *reh'g en banc granted, opinion vacated*, 936 F.3d 182 (3d Cir. 2019) .................................10

*Pickard v. Amazon.com, Inc.*,
    387 So. 3d 515 (La. 2024) ............................................................................. *passim*

*Skaggs v. Amazon.com, Inc.*,
    334 So. 3d 780 (La. App. 2021)................................................................12, 20, 25

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
    528 F. Supp. 3d 686 (W.D. Ky. 2021)...................................................................22

*Stone Energy Corp. v. Nippon Steel*,
    475 F. Supp. 3d 563 (W.D. La. 2020).........................................................8, 11, 13

**Statutes**

La. Civ. Code art. 11 ..........................................................................................5

La. Civ. Code art. 2323 ......................................................................................8

La. R.S. 1:3 ........................................................................................................5

La. Stat.
    § 9:2800.52 ....................................................................................................5
    § 9:2800.53(1)(d) ..........................................................................................5
    § 9:2800.53(d) ..............................................................................8, 11, 12

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................4

Fed. R. Civ. P. 56(c) ..........................................................................................4

Fed. R. Evid. 704 ...............................................................................................7

Fed. R. Evid. 705 ...............................................................................................7

**Other Authorities**

Black's Law Dictionary (2019) ..........................................................................5

CBS News, *Amazon is Legally Responsible for Recalling Dangerous Products
    Sold on Its Site, Agency Finds* (July 30, 2024) ...........................................1

Edward Janger & Aaron Twerski, *Functional Tort Principles for Internet
    Platforms: Duty, Relationship, & Control*, 26 Yale J.L. & Tech. 1 (2023) ............8, 9, 10, 12

John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev.
    565 (1989)...........................................................................................8, 10

Louisiana Tort Law § 5.02 (2024) ......................................................................24

Merriam-Webster ................................................................................................5

RESTATEMENT (SECOND) OF TORTS § 324A (1965) ................................................................18, 24

Tanya J. Monestier, *Amazon As A Seller of Marketplace Goods Under Article 2*, 107 CORNELL L. REV. 705 (2022) ...........................................................................................11

## SUMMARY JUDGMENT EVIDENCE[1]

Plaintiffs attach and incorporate the following evidence in support of this response:

| | |
|---|---|
| Exhibit 1 | Product Safety and Compliance in our Store (Horn Dep. Ex. 2) |
| Exhibit 2 | Deposition of Andy Sachs (Amazon Corporate Representative) |
| Exhibit 3 | Affidavit of Richard Meier |
| Exhibit 4 | Declaration of Paul Chen |
| Exhibit 5 | Amazon Return Ticket (AMZ_PICKARD_00000354-55) |
| Exhibit 6 | Amazon Product Safety and Compliance (Investigations Procedure_ (AMZ_PICKARD_00000325-46) |
| Exhibit 7 | Amazon Restricted Products Policy (AMZ_PICKARD_00000161-164) |
| Exhibit 8 | Amazon Restricted Products Policy (AMZ_PICKARD_00000223-26) |
| Exhibit 9 | Amazon Product Safety Alerts Policy |
| Exhibit 10 | Amazon Selling Restrictions on Safety Risk Products |
| Exhibit 11 | Amazon Dangerous Goods Review Policy |
| Exhibit 12 | Amazon Dangerous Goods Required Information |
| Exhibit 13 | Amazon Product Safety Recalls (AMZ_PICKARD_00000358-63) |
| Exhibit 14 | Deposition of John Horn (Amazon Corporate Representative) |
| Exhibit 15 | Affidavit of Angela Pickard |
| Exhibit 16 | Amazon Product Safety and Compliance (AMZ_PICKARD_00000221-22) |
| Exhibit 17 | Customer Review (AMZ_PICKARD_00000630-32) (Horn Dep. Ex. 3) |
| Exhibit 18 | Customer Review AMZ_PICKARD_00000643-45) |
| Exhibit 19 | Customer Review (AMZ_PICKARD_00000640-42) (Horn Dep. Ex. 6) |
| Exhibit 20 | Amazon Report No. WUX202008032381S (AMZ_PICKARD_00000045-108) |

[1] Per the Court's instruction, no new evidence is attached to this summary judgment response. Plaintiffs attach and incorporate the same evidence that was attached to Plaintiffs' original summary judgment response and merely attach the evidence to this filing (and provide this table) for the Court's convenience.

| Exhibit 21 | Product Safety Investigation (AMZ_PICKARD_00000352) (Horn Dep. Ex. 13) |
|---|---|
| Exhibit 22 | Deposition of George Casellas |
| Exhibit 23 | Deposition of Richard Meier |
| Exhibit 24 | Mr. Pickard's Amazon Order (Sachs Dep. Ex. 2) |
| Exhibit 25 | Mr. Pickard's Amazon Order (Sachs Dep. Ex. 3) |
| Exhibit 26 | Shipment of Mr. Pickard's Amazon Order (Sachs Dep. Ex. 4) |
| Exhibit 27 | Amazon's Fees Related to Mr. Pickard's Amazon Order (Sachs Dep. Ex. 5) |
| Exhibit 28 | Amazon Services Business Solutions Agreement (Sachs Dep. Ex. 10) (AMZ_PICKARD_00000001-30) |
| Exhibit 29 | Declaration of Andy Sachs (*Adkins v. Amazon.com, Inc.*, No. 3:22-cv-00083, Doc. #36-1 (S.D.W.Va. Mar. 24, 2023). |
| Exhibit 30 | Amazon Guide to Fulfillment |
| Exhibit 31 | *In the Matter of Amazon.com, Inc.*, CPSC Doc. No. 27 |
| Exhibit 32 | Consumer Product Safety Commission Order (May 8, 2023) |
| Exhibit 33 | Lauren Ann Shrem Declaration of October 14, 2022 |
| Exhibit 34 | Product Safety Investigation (AMZ_PICKARD_00000350-00000351) |
| Exhibit 35 | Customer Review (AMZ_PICKARD_00000319) |
| Exhibit 36 | Amazon Product Compliance Guidelines (Horn Dep. Ex. 14) |
| Exhibit 37 | Declaration of Greg Campbell |
| Exhibit 38 | Amazon Listing Page for 18650 Rechargeable Li-Ion Battery Charger 4-Slot Universal Smart Li-Ion Battery Charger |
| Exhibit 39 | Amazon Listing Page for Jisell 8 Slot[s] AA AAA Rechargeable Battery Charger for Ni-MH Ni-CD Batteries |
| Exhibit 40 | Affidavit of Janie Jordan |

## INTRODUCTION

After this Court found that "certification of two questions" to the Louisiana Supreme Court was "necessary to resolve" Amazon's prior summary judgment motion, Doc. #96 at 1, that court answered both questions in Plaintiffs' favor and held that remaining "factual issues" are the "responsibility" of the factfinder. *Pickard v. Amazon.com, Inc.*, 387 So. 3d 515, 526 (La. 2024).

Amazon apparently believes that those answers were immaterial. But its motion demonstrates why this Court asked the Louisiana Supreme Court to devote its limited resources to the certified issues instead of itself deciding this case on Amazon's alternate grounds. Amazon attacks a strawman: that "Plaintiffs' theory is built on disassembling and inspecting products[.]" Doc. #109-1 at 2. Plaintiffs make no such claim. That confusion is indefensible after Judge McClusky corrected Amazon on this[2] and full briefing in this Court and the Supreme Court pointed out Amazon's error.[3] Amazon must run from Plaintiffs' actual allegations because Amazon ***did*** make the undertakings at issue. Just before it filed this motion, Amazon told the media:

> We stand behind the safety of every product in our store . . . regardless of whether it is sold by Amazon or by one of our selling partners . . . We have proactive measures in place to prevent unsafe products, and we continuously monitor the listings in our store. If we discover an unsafe product available for sale, we address the issue immediately.[4]

Two weeks later, Amazon told this Court that "[t]here is no possible way" to perform such an undertaking: "[n]obody does that." Doc. #109-1 at 24. Amazon, if it dares, can tell a jury it didn't mean what it publicly said. But after making billions of dollars inducing consumers to rely upon such undertakings, it cannot escape liability as a matter of law. A jury must resolve this case.

---

[2] Plaintiffs "***concede that Amazon had no duty to inspect battery chargers***, but seek to discover what Amazon knew, or should have known, ***based on the investigations that it chose to undertak***e." Doc. #48 at 14 (emphasis added).

[3] Amazon's description of the undertaking is "not true"; "[A]ll Amazon had to do was request testing documentation—and the lack of such documentation would have indicated that it should remove this battery charger from its website." Doc. # 69-1 at 17; *see also* Doc. #96 at 11-12 (summarizing undertaking); Plaintiffs' Original BOM at 22 (similar).

[4] CBS News, *Amazon is Legally Responsible for Recalling Dangerous Products Sold on Its Site, Agency Finds* (July 30, 2024), https://tinyurl.com/yu4n26yk.

## Factual Background

This case is about the failure of Amazon to follow through with the safety-related undertakings that it spent years convincing the public to rely upon. After some—including the Wall Street Journal—doubted the effectiveness of Amazon's safety program, Amazon went to great efforts to reassure the public "about [its] industry-leading safety and compliance program," and detailed an extensive undertaking related to product safety. Ex. 1. During that time, Amazon capitalized enormously on the reputation that it developed.

Archie Pickard purchased a battery charger sold by a third-party—a foreign manufacturer, Jisell—on Amazon's website. Doc. #59-4 ("18650 Rechargeable Li-ion Battery Charger 4 Slot Universal Smart Li-ion Batteries Charger"); Exs. 24-27; *see infra* at 11 n. 8. The order was fulfilled by Amazon—meaning that Amazon had a much more intimate involvement with this order than a typical third-party sale. Ex. 2 at 157-78, 161; Ex. 37.

Unknown to Mr. Pickard, this battery charger was a fire risk. While Mr. Pickard was sleeping in the early morning hours of December 21, 2019, this battery charger, unfortunately, caught fire as a result of a defective electrical cord. Ex. 3 at 2. Plaintiffs allege that Mr. Pickard sustained severe burns due to the fire and ultimately died as a result of the burn injuries and their complications. Doc. #17 at 14.



**Scene photograph of Pickard residence**



**Scene photograph of battery charger**

This defect, caused by a poor manufacturing process, plagued several other similar battery chargers that utilized the same electrical cord. *See* Ex. 4 at 4-7 ¶¶8-9; *see* Exs. 38-39.

Amazon knew, or should have known, as much. It received several complaints about a substantively similar, six-slot, Jisell battery charger—that contained the same defective electrical cord—before Mr. Pickard purchased his battery charger. Ex. 4 at 7-25 ¶¶10-15. The fire hazard posed by this similar battery charger could not have been more clear. Customers called this similar battery charger "dangerous" and a "fire hazard" or complained that it "[s]parked like crazy when first plugged in," while another noted that there were "sparks from cord when plugging [it] into [a] household outlet." *Id.* at 7-11 ¶10 (citing Exs. 17-18). One customer review is particularly haunting in light of Mr. Pickard's incident, specifically warning that "SOMEONE LESS KNOWLEDGEABLE MIGHT HAVE BURT [sic] THEIR HOUSE DOWN." *Id.*

Amazon had knowledge of these customer reviews of the similar battery charger as a result of the safety processes that it tells the public it undertakes—undertakings that this Court has already recognized and explained in great detail. *See* Doc. #48 at 10-14; Doc #96 at 4-5, 11-12. Amazon touted these safety undertakings, which it "carefully" and "clearly designed" to "assure consumers about the platform's purported product safety" "in the hopes that consumers will enhance their opinion of the platform's reliability and trustworthiness, and entrust it," "rather than" another seller "with their business." Ex. 4 at 26-27 ¶16. In particular, Amazon's machine learning and natural language tool identified safety incidents of the ***similar*** charger and flagged them as "high" severity for investigation. *Id.* at 7-11 ¶10 (citing Exs. 17-19). A reasonable actor would have begun an investigation—and, if appropriate, removed the product. *Id.* at 20-25 ¶15.

Amazon did not. Amazon reacted by "clos[ing] out reports of fire hazard either as 'isolated incidents,' or by simply taking no further action." *Id.* at 21 ¶15.; *see* Ex. 5, Ex. 35.

If Amazon had performed its product safety services properly, it would have discovered that both battery chargers were substantively similar and both models posed safety hazards. Ex. 4 at 22 ¶15; *see* Ex. 34. In other words, Amazon's actual knowledge of the risks of the similar battery charger gave Amazon at least constructive knowledge of the risks associated with this charger.

Plaintiffs—"the children of decedent, Archie Pickard"—brought "this wrongful death and survival action to recover damages following Pickard's death," Doc. #48 at 2, (1) under the LPLA, (2) for undertaking, and (3) for non-manufacturing seller liability. Doc. #17 at 14-17. After previous summary judgment briefing (Docs. #59, 69, 76), this Court certified two issues to the Louisiana Supreme Court because doing so was "necessary to resolve Amazon's Motion[.]" Doc. #96 at 1. After the Supreme Court decided both questions in Plaintiffs' favor, Amazon moved again for summary judgment, repeating its previous motion's alternate grounds. Doc. #109.

## STANDARD OF REVIEW

Summary judgment standards are well-established. A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he burden is on the party moving for summary judgment to produce evidence showing an absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); FED. R. CIV. P. 56(c).

## ARGUMENT

Fact issues preclude summary judgment on Plaintiffs' three claims against Amazon:[5] (1) under the LPLA, (2) for non-manufacturer seller liability, and (3) for negligent undertaking.

**I.      Amazon is liable under the Louisiana Products Liability Act as a "manufacturer."**

Amazon first challenges the Louisiana Products Liability Act ("LPLA") claim.

---

[5] This is a diversity case. Louisiana law applies to the substantive claims in this case.

The LPLA imposes liability on "manufacturers for damages caused by their products." LA. STAT. § 9:2800.52. Amazon originally challenged three parts of the LPLA's "manufacturer" status:

> A ***seller*** of a product of an alien manufacturer if the seller is in the business of importing or ***distributing the product for resale*** and ***the seller is the alter ego of the alien manufacturer***.

LA. STAT. § 9:2800.53(1)(d) (emphasis added).

Amazon recognizes that the Louisiana Supreme Court rejected Amazon's primary challenge to Plaintiffs' LPLA claim: that it is not a seller. Doc. #109-1 at 1; *Pickard*, 387 So. 3d at 517 ("We answer that question in the affirmative"). So it repeats its prior summary judgment arguments that it does not "distribut[e] the product for resale" and is not "the alter ego" of Jisell. LA. STAT. § 9:2800.53(1)(d). Fact issues preclude summary judgment on both issues; indeed, there was no reason to certify the question of Amazon's seller status if either precluded this LPLA claim.

### A.    Amazon is in the business of distributing the product for resale.

Amazon is "in the business of . . . distributing the product for resale." LA. STAT. § 9:2800.53(1)(d).[6] While the Louisiana Supreme Court did not directly address whether Amazon is in the business of distributing the product for resale, its reasoning leaves no doubt that Amazon satisfies this part of the LPLA. *Contra* Doc. #109-1 at 1, 12-13.

The LPLA does not define the term "distributing," so its "generally prevailing" meaning controls. *See Pickard*, 387 So. 3d at 519-20 (citing Merriam-Webster to define LPLA terms); *see also* LA. CIV. CODE ART. 11; LA. R.S. 1:3. The term "distribute" includes to "deliver" or "disperse." BLACK'S LAW DICTIONARY, DISTRIBUTE (2019); MERRIAM-WEBSTER, DISTRIBUTING https://tinyurl.com/mt94wsjv ("to give out or deliver especially to members of a group").

---

[6] Whether Amazon "import[ed] Jisell's products" is immaterial. Doc. #109-1 at 10. The LPLA contains the disjunctive, "or," in this part of the manufacturer definition. LA. STAT. § 9:2800.53(1)(d). Amazon distributed Jisell's products.

Amazon easily satisfies this definition. Amazon, through the FBA process, clearly resells Jisell's products and delivers its products. Amazon refers to its FBA delivery operations as distributing products. Ex. 30 at 8-9 ("distribution location," "fulfillment network"). A key aspect of the FBA process is that Amazon will deliver or disperse the product:

> As part of our fulfillment services, we will ship Units from our inventory of Your Products to the shipping addresses in the Elected Country included in valid customer orders, or submitted by us as part of a Fulfillment Request. We may ship Units together with products purchased from other merchants, including any of our Affiliates. We also

Ex. 28 at 18. Unsurprisingly, Amazon's corporate representative testified that it distributed this product. Ex. 2 at 49 ("Q. This is the fee that Jisell" paid "for Amazon pulling the product off the self, packing it up and shipping and distributing it to Mr. Pickard? . . . A. Yes."); *see id.* at 39; Ex. 29 at 2, 5-6 (Amazon's corporate representative admitted that Amazon "fulfill[s] the order.").

Consistent with this evidence, the Louisiana Supreme Court repeatedly referred to Amazon as being in the business of distributing the battery charger at issue. Amazon "'controlled the process of the transaction and delivery' necessary to convey ownership and possession of the product to the buyer[.]" *Pickard*, 387 So. 3d at 520. Its role went beyond merely having "temporary possession or transient control"; it "had physical custody of the product in its distribution warehouse" and "provided a service that included collecting the payment for Jisell." *Id.* at 520-22.

Amazon has also lost this issue nationally. Relying on a similar definition as Plaintiffs, the Consumer Product Safety Commission found Amazon "distribut[es]" products because it "(1) stores the merchants' products at its facilities, (2) retrieves them from its inventory of Program merchants' products, (3) places the products in shipping containers, and (4) delivers them directly to consumers by Amazon delivery vehicles or by carriers with whom Amazon contracts." Ex. 31 at 7-8; *see In re Amazon.com, Inc.*, CPSC No. 21-2 at 2, 27-31, https://tinyurl.com/4p956npb ("adopt[ing] the ALJ's finding that Amazon operated as a distributor" through the FBA program).

Amazon's argument that an "agency's interpretation of a federal statute has no bearing on

the meaning of 'distributor' in Louisiana law," Doc. #109-1 at 12, is right insofar as it goes, but is

no response to a neutral decisionmaker's reasoning applying the same meaning of "distribution."[7]

Amazon's affirmative argument is nothing more than an attempt to revive its discredited

theory that it must hold "title" to a product to be liable under the LPLA. *Cf.* Doc. #109-1 at 11

("Amazon is not an intermediate seller (distributor) because it never took title to the product[.]").

This effort requires Amazon to advocate to utilize the narrowest definition of ***another word***—

"distributor" rather than the LPLA's term "distributing." *See id.* But even that definition does not

include an express requirement that the distributor take ***title*** to the product.

Of course, "intermediate product sellers" are in the business of distributing products. *Id.*

But none of the authorities that Amazon cites state that ***only*** intermediate product sellers satisfy

this part of the LPLA. Indeed, the Louisiana Supreme Court indicated that Amazon's FBA process

was analogous to the "involvement" of a defendant who was held to be a distributor in an authority

that Amazon cites. *Pickard*, 387 So. 3d at 520 (concluding that "[l]ike the distributor in [*Media*

*Prod. Consultants, Inc. v. Mercedes-Benz of N. Am., Inc.*, 262 So.2d 377 (La. 1972)], the operator's

involvement can form a substantial and material part of the transaction"). Just like Amazon was

wrong to graft a title requirement onto the "seller" definition, it errs in seeking to displace the plain

meaning of "distributing the product" with a rigid definition of a different term, "distributor."

**B.      Amazon is the alter ego of the manufacturer.**

Amazon is the alter ego of the manufacturer. The LPLA provides four factors to consider

"in determining whether the seller is the alien manufacturer's alter ego"; *i.e.* "whether the seller":

---

[7] Similarly, Amazon's argument regarding Plaintiffs' expert is misplaced. *See* Doc. # 109-1 at 11-12. Plaintiffs' expert
does not provide the basis for defining a legal term; he merely applies Amazon's process to the plain understanding
of the term. This is proper expert testimony. *See* FED. R. EVID. 704 ("An opinion is not objectionable just because it
embraces an ultimate issue"); FED. R. EVID. 705 ("an expert may state an opinion—and give the reasons for it").

[1] "is affiliated with the alien manufacturer by way of . . . control";

[2] "administers product warranty obligations of the alien manufacturer";

[3] "prepares or modifies the product for distribution"

LA. STAT. § 9:2800.53(d). A court may also consider "any other relevant evidence." *Id.* A fact issue on "two of" those factors warrants denial of summary judgment. *Stone Energy Corp. v. Nippon Steel*, 475 F. Supp. 3d 563, 570 (W.D. La. 2020).

This label, plainly, does not strictly refer to "alter ego" in the technical sense, but to circumstances in which the seller has essentially made itself interchangeable with the manufacturer in the mind of the purchaser. In such a case, the "seller-distributor" "may be the only defendant available to the plaintiff," so it should "bear the loss." John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L. REV. 565, 575 (1989). This test recognizes that sellers can seek indemnity through the distribution chain—and indeed, Amazon requires sellers to maintain various types of "insurance" "naming Amazon . . . as additional insured[.]" Edward Janger & Aaron Twerski, *Functional Tort Principles for Internet Platforms: Duty, Relationship, & Control*, 26 YALE J.L. & TECH. 1, 31 (2023); *see* Ex. 28 at 4. Thus, a finding that Amazon is an alter ego of the manufacturer does not mean the loss will ultimately fall on Amazon; it means the injured consumer will be able to recover fair compensation and the cost of that compensation will be shifted back to the foreign manufacturer—who plaintiffs cannot sue directly—through its contractual indemnity. And Amazon can point the finger at the absent manufacturer at trial through comparative fault. *See* LA. CIV. CODE ART. 2323. Thus, an alter ego finding will not shift all the liability to Amazon.

### 1.    Amazon "is affiliated with" Jisell "by way of . . . control."

A fact issue exists as to whether Amazon is "affiliated" with Jisell by way of "control." LA. STAT. § 9:2800.53(d). The FBA agreement clearly affiliates Amazon and Jisell. Ex. 28 at 16 (§ F-1) ("accepted into FBA"). The pertinent inquiry is whether Amazon had control over Jisell.

Amazon controls nearly every aspect of a sale in its hybrid role through the FBA program, and Jisell was subject to those policies. *See* Ex. 28. Commentators and courts have noted the ubiquitous level of Amazon's control over sales of third-party products on the Amazon website. "Amazon's control of the consumer product transactions conducted on its platform is pervasive and all encompassing." Janger & Twerski, *Functional* 26 YALE J.L. & TECH. at 10. Its "business model rests on its exercise of almost complete control of the transaction between a third-party seller and their buyer." *Id.* at 28. "Through this control, third-party manufacturers often become 'virtually anonymous'" and consumers depend 'on Amazon's name, input, and control.'" *M. S. v. Amazon.com, Inc.*, No. 3:23-CV-0046, 2023 WL 8283642, at *1 (S.D.W. Va. Nov. 30, 2023).

Some of the ways that Amazon controls entities like Jisell include:

- "Amazon in its sole discretion determines and approves the content, appearance, design and described functionality of any product that it puts on its online platform." Janger & Twerski, 26 YALE J.L. & TECH. at 30; *see* Ex. 28 at 14 (§ S-6).

- "Amazon determines the ability of third-party vendors to communicate with Amazon customers without its permission" Janger & Twerski, 26 YALE J.L. & TECH. at 30. "Amazon controls how the consumer learns the seller's identity and does so quietly." *Id.* at 54; *see* Ex. 28 at 1, 19-20 ("You will use only a name you are authorized to use").

- "Payments for all sales made on Amazon are made to Amazon, not to the third-party seller[.]" Janger & Twerski, 26 YALE J.L. & TECH. at 30; Ex. 28 at 12 (§ S-1.2) (Amazon will "receive all sales proceeds").

- "Amazon provides all customers who purchase on its website, including purchases from third-party vendors, an 'A-to-Z Guarantee' that covers defective products[.]" Janger & Twerski, 26 YALE J.L. & TECH. at 30. "By guaranteeing satisfaction and an open return policy, Amazon communicates to the consumer that Amazon is in charge of the transaction." *Id.* at 54; *see* Ex. 28 at 13 (§ S-3).

- "When a single product is offered by multiple sellers, Amazon determines which seller will get the first chance to sell the product as a 'Featured Offer.'" Janger & Twerski, 26 YALE J.L. & TECH. at 32. It may "commingle Units" from multiple third-party sellers, leaving a buyer without knowledge of which party the product originated from. *See* Ex. 28 at 16-19.

  - "Once an item is sent to one of Amazon's fulfillment centers, the seller never touches it again." Janger & Twerski, 26 YALE J.L. & TECH. at 49-50. Amazon stored Jisell's products and controlled its product preparation, packaging, and labeling. Ex. 28 at 18-20.

In short, "[o]nce a consumer has identified a product to buy, Amazon handles virtually all aspects of that transaction[.]" Janger & Twerski, 26 YALE J.L. & TECH. at 30. "Amazon create[s] an extensive and robust relationship with the customer" and takes "steps to place itself at the *center* of any relationship that might develop between the third-party seller and the customer." *Id.* at 54. Amazon has "designed" an environment in which its "customers are particularly vulnerable" by being left unable "to locate the third-party vendor[.]" *Bolger v. Amazon.com, LLC*, 267 Cal. Rptr. 3d 601, 617 (Cal. App. 2020); *Oberdorf v. Amazon.com Inc.*, 930 F.3d 136, 147-48 (3d Cir. 2019), *reh'g en banc granted, opinion vacated*, 936 F.3d 182 (3d Cir. 2019).

The Louisiana Supreme Court cited many of these facts in rejecting Amazon's efforts to cast itself as a mere "delivery service[.]" *Cf. Pickard*, 387 So. 3d at 518, 522. This evidence answers Amazon's argument that "Amazon has no . . . control of Jisell[.]" Doc. #109-1 at 12.

Amazon ignores this evidence of control. Instead, it relies upon a contractual disclaimer of a "relationship" with Jisell. *Id.* at 12-13. But the "commercial reality could not be further from that description[.]" Janger & Twerski, 26 YALE J.L. & TECH. at 20. At best, there is a factual dispute.

Amazon argues that it "has no control over what sellers decide to sell or where and how beyond Amazon's store they sell their products." Doc. #109-1 at 13. Amazon's argument proves too much. It cites no authority for the proposition that a lack of control over ***other*** sales is relevant. Alter ego status is based upon a policy concern centered on the particular transaction at issue. *See* Kennedy, 49 LA. L. REV. at 575 ("[T]he only defendant available to the plaintiff"). If all that was required to defeat a showing of control is an allegation that a foreign seller could choose to sell to other entities, any seller of a foreign manufacturer's product—who is not under duress and, thus, free to have relationships with other entities—could escape this part of the alter ego definition. What Jisell does ***outside*** Amazon is not responsive to this transaction or relationship.

Amazon's "wholly disingenuous" representations "to minimize its role" notwithstanding, it "is the business equivalent of the helicopter parent." Tanya J. Monestier, *Amazon As A Seller of Marketplace Goods Under Article 2*, 107 CORNELL L. REV. 705, 774 (2022). Amazon is affiliated with Jisell by way of control. At a minimum, this evidence of the invasive control that Amazon operates over the delivery chain is "other relevant evidence" of its affiliation with Jisell. *See* LA. STAT. § 9:2800.53(d).

       2.    **Amazon "assumes or administers product warranty obligations of the alien manufacturer."[8]**

Amazon's FBA warranty obligations satisfy the second alter ego factor. Because the LPLA only requires that Amazon "administer[]" the warranty, it is sufficient that Amazon "pass[es] on" any warranty guarantees to the buyer. *Stone Energy*, 475 F. Supp. 3d at 569-70.

Amazon assumes or administers warranty obligations by accepting returns of any defective Jisell products sold through the FBA program. It provides customers an "A-to-Z Guarantee" under which Amazon retains ultimate discretion in resolving "claim[s]" or "dispute[s]" brought by customers. Ex. 28 at 13. Further, Amazon imposes its "Refund Policies" on Jisell and "accept[s]" and "process[es]" "returns . . . for the benefit of customers":

> **S-2.2 Cancellations, Returns, and Refunds.** The Amazon Refund Policies for the applicable Amazon Site will apply to Your Products. Subject to Section F-6, for any of Your Products fulfilled using Fulfillment by Amazon, you will promptly accept, calculate, and process cancellations, returns, refunds, and adjustments in accordance with this Agreement and the Amazon Refund Policies for the applicable Amazon Site, using functionality we enable for your

*Id.*; *see also id.* at 18 ("We will receive and process returns"; "we determine [if a product] is an Unsuitable Unit").

Amazon also retains the right to "determine whether a customer will receive a refund":

---

[8] The analysis on the second and third factors is the same if Guangzhou is the manufacturer. Doc. # 109-1 at 12 n.1.

> **F-8.2** We will be responsible for all customer service issues relating to packaging, handling and shipment, and customer returns, refunds, and adjustments related to Amazon Fulfillment Units. We will determine whether a customer will receive a refund, adjustment or replacement for any Amazon Fulfillment Unit and we will require you to reimburse us where we determine you have responsibility in accordance with the Agreement (including these FBA Service Terms and the Program Policies). We will promptly notify you when you are responsible for a customer refund. You may appeal if you disagree with our finding within thirty (30) days after our notification, in

*Id.* at 19.

The proposition that Amazon administers warranty obligations for Jisell should be beyond controversy. Amazon's corporate representative acknowledged that "Amazon will handle a return or exchange." Ex. 2 at 179-80. The Consumer Product Safety Commission details the procedure by which "customers return their product to Amazon" at length. Ex. 32 at 6-7; *see also* Janger & Twerski, 26 YALE J.L. & TECH. at 33, 49-50.

Amazon does not even acknowledge these processes. Its main response is to cite *Skaggs v. Amazon.com, Inc.*, 334 So. 3d 780, 790 (La. App. 2021), which stated that "Amazon does 'not assume or administer product warranty obligations' for third parties." Doc. #109-1 at 13. *Skaggs* is inapposite. Amazon has blindly relied upon *Skaggs* before—and has been repeatedly admonished, including by the Louisiana Supreme Court, that *Skaggs* "is factually distinguishable." *Pickard*, 387 So. 3d at 523; *see* Doc. #96 at 8; *cf.* Doc. #48 at 13. These warranty provisions are part of the FBA program—which was not at issue in *Skaggs*. *See* 334 So. 3d at 787.

As a last gasp, Amazon clings to its self-serving contractual disclaimer that Amazon "does not assume any responsibility or liability for the . . . product." Doc. #109-1 at 13-14. This label does not control over the substance of the FBA program. A jury can weigh this disclaimer against the commercial reality, but this disclaimer does not warrant summary judgment on this factor.

### 3.    Amazon "prepares or modifies the product for distribution."

Finally, Amazon clearly "prepares . . . the product for distribution" through its FBA program. LA. STAT. § 9:2800.53(d). Through the FBA program, Amazon is responsible for all customer service issues relating to packing, handling and shipment, and returns:

> As part of our fulfillment services, we will ship Units from our inventory of Your Products to the shipping addresses in the Elected Country included in valid customer orders, or submitted by you as part of a Fulfillment Request. We may ship Units together with products purchased from other merchants, including any of our Affiliates. We also may ship Units separately that are included in a single Fulfillment Request. If you participate in our export fulfillment services, we will also ship Your Products that we determine to be eligible (each, a **"Foreign-Eligible Product"**) to Foreign Addresses within countries we determine to be eligible for foreign shipments, subject to the additional terms on foreign shipments in the applicable FBA Guidelines.

Ex. 28 at 18-19 (§F-8.2: Amazon is "responsible for all customer service issues related to packaging, handling, and shipment"); *see also see* Ex. 2 at 49, 177-180.

Amazon does not dispute its role in preparing the product for distribution. It simply tries to downplay its significance. Doc. #109-1 at 14 ("limited acts"). Despite its error being corrected when Amazon made this argument earlier, Doc. #59-1 at 14, Amazon still claims that *Stone Energy* holds that "substantial interaction [with the product] must be present" for this factor to be satisfied. Doc. # 109-1 at 14. *Stone Energy* actually **disagrees** with that proposition. 475 F. Supp. 3d at 570 (This factor requires something "***less*** hands-on than 'influencing and controlling' the product.") (emphasis added). That question "of degree" is a fact question. *See id.*

* * *

The parties hotly dispute the precise scope of Amazon's business model, but that is an issue for the jury, not for summary judgment. Now that the legal question of Amazon's "seller" status, which this Court found "necessary" to resolve this claim, Doc. #96 at 1, has been resolved by the Louisiana Supreme Court, these remaining fact-bound issues must be resolved by a jury.

## II.    Plaintiffs assert a viable alternative non-manufacturing seller liability claim.

Amazon is liable under the non-manufacturing seller claim.

### A.    Amazon is a seller.

This Court has already found that "the LPLA's definition of 'seller' also applies to claims against non-manufacturing sellers." Doc. #96 at 6 (collecting authorities). Louisiana intermediate courts apply the LPLA's definition to this claim. *Id.* Amazon also previously asserted that "[t]he LPLA's definition of 'seller' governs non-manufacturing seller claims." Doc. #59-1 at 15.

Now that the Louisiana Supreme Court has held that Amazon is a seller under the LPLA, seller status for the non-manufacturing seller claim is definitely established under Louisiana law. *Pickard*, 387 So. 3d at 517.

But Amazon now calls its previous position "incongruous" and adopts a new position: "the Louisiana Supreme Court's opinion" "does not" "mean[] that Amazon is a 'seller' for purposes of [a] non-manufacturing seller claim." Doc. #109-1 at 15. Amazon is correct that the Supreme Court said that its "holding is limited to the term 'seller' as specifically defined in the" LPLA. *Pickard*, 387 So. 3d at 523. But it did not displace the authorities applying the LPLA's seller definition to a non-manufacturing seller claim. *See id.* ("express[ed] no opinion"). Thus, a federal court sitting in diversity is not free to second-guess the decisions of the state appellate courts—especially when the Louisiana Supreme Court declined to adopt a different definition. *Cf. Harken Expl. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 n.3 (5th Cir. 2001) ("[W]e must not expand state law beyond its presently existing boundaries.").

In any event, this issue is a red herring because Louisiana law recognizes a "universal duty" of any defendant "to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit*, 707 So.2d 1225, 1231 (La. 1998*); see Doe v. McKesson*, 339 So.2d 524 (La. 2022). If Amazon knew or should have known that a product in its marketplace was dangerous, it owed a duty of reasonable care to eliminate that risk—regardless of whether it is a "seller" of the product.

Furthermore, Amazon offers no reason to conclude that the definition of seller for purposes of a non-manufacturing seller claim should be ***narrower*** than the definition under the LPLA. Amazon certainly advances no other definition of "seller" that Louisiana law utilizes for purposes of a non-manufacturing seller claim—or that this Court sitting in diversity should adopt.

14

Instead, Amazon stubbornly continues to compare itself to a mere "delivery service[]." Doc. #109-1 at 16. But the Louisiana Supreme Court emphatically "disagree[d]" that Amazon was anything like a delivery service because it "provided a [much broader] service." *Pickard*, 387 So. 3d at 522-23. Amazon still is in denial about the facts and current Louisiana law.

Amazon did not develop a seller status argument consistent with existing Louisiana law.

## B.    Amazon knew, or should have known, of the battery charger's defects.

Amazon should have known of the product defect. For a non-manufacturing seller to be liable for tort damages, the seller "must have had actual or constructive knowledge that the product it sold was defective." *Alexander v. Toyota Motor Sales*, 123 So. 3d 712, 714 (La. 2013). Amazon's safety-related undertakings gave it actual knowledge (from its review of costumer comments) of the defect in the ***similar*** battery charger. *Supra* at 3-4. That information created at least constructive knowledge of the defects in ***this*** battery charger. Ex. 4 at 4-25 ¶¶8-15. If Amazon had acted reasonably by asking for testing documentation to investigate the similar battery charger, it would have discovered the common defect in both that charger and this battery charger.

***Amazon should have asked for testing documentation***. Plaintiffs' expert testified that industry standards require a reasonable and prudent ecommerce platform to "verify that compliant product safety documentation existed for the battery chargers prior to their being offered for sale (or at the very least after reports of fire hazard in October, 2019)." *Id.* at 23-24 ¶15(b). Insisting on such documentation is a "reasonable and prudent method of ensuring that unsafe products are not placed into the hands of a consumer through that platform's distribution network." *Id.* "Had Amazon chosen to verify compliance prior to sale, or even after customer reports of fire hazard with respect to 6-slot chargers in October, 2019, this tragedy [which occurred in December 2019] could have been avoided." *Id.*

15

***Testing documentation would have revealed this product defect***. The testing report that Amazon would have obtained showed that (1) the other battery charger was substantively similar to the one that Mr. Pickard purchased and (2) both chargers were defective. *Id.* at 20-25 ¶15.

Far from challenging this part of the expert opinion, Amazon's summary judgment briefing admits the pertinent facts showing what Amazon would have learned had it acted reasonably:

- "After Pickard served this lawsuit," Amazon "removed the product from the store" on a temporary basis and asked Jisell for "documentation that the product complied with Underwriters Laboratories ('UL') Standard 1310." Doc. #109-1 at 8.

- "Jisell produced a test report, but Amazon declined to reinstate the product because the report did not address compliance with UL 1310." *Id.*

Verifying compliance with the UL standards is necessary because failure to comply with those standards increases the risk of a manufacturing defect. *See* Ex. 4 at 24 ¶15 (obtaining testing verification "increases the likelihood that non-compliant products, which may contain manufacturing defects and other hazards, because they do not conform to industry standards such as those promulgated by Underwriters Laboratories," do "not reach the consumer").[9] Amazon does not appear to disagree; notably, it does not challenge this expert opinion. Further, its corporate representative confirmed that a reasonable investigation would have led Amazon to request "proper documentation" from Jisell, and Jisell's inability to document compliance with safety requirements would have led to the indefinite suspension of this battery charger on Amazon's website. Ex. 14 at 133-37, 150-51 ("[T]hey did not submit a testing document back that proved compliance with UL 1310."). Indeed, that is ultimately what happened to the battery charger Mr. Pickard purchased. *Id.*; *see also* Ex. 21 at AMZ_PICKARD_00000352.

---

[9] Amazon is wrong to argue that Plaintiffs' expert "presumes there was a defect in a particular model electrical cord that dictates that all electrical cords of that design are defective." Doc. #109-1 at 17 (discussing hypothetical about "tire on one car"). A failure to follow a compliant manufacturing process will likely lead to manufacturing defects. Ex. 4 at 24 ¶15. If Amazon obtained a report showing no compliance with standard manufacturing standards, it would have known that the common electrical cord was likely to have a manufacturing defect. *See id.*

The testing document is also important because it identified ***eight*** similar battery chargers (which "were the same except for model name and appearance") to which its conclusion applied—including the battery charger with negative customer reviews (Model 829) and the battery charger that Mr. Pickard purchased (828GA). Ex. 20 at AMZ_PICKARD_00000045, 48; Ex. 4 at 4 ¶8. Expert testimony allows a jury to conclude that, if Amazon had reasonably investigated the similar battery charger, it would have uncovered that this battery charger suffered from the same issues and would have removed both chargers from its product listings. Ex. 4 at 20-25 ¶15.

***Amazon's continued efforts to misrepresent Plaintiffs' claim.*** Amazon attacks a strawman when it argues that Plaintiffs advocate for an "onerous duty" that would require Amazon to "disassemble[] and inspect[] the battery charger." Doc. #109-1 at 17-19. Contrary to Amazon's false assertion that "Plaintiffs' theory is built on disassembling and inspecting products to infer defects in different products," *id.* at 2, this has ***never*** been Plaintiffs' theory—and Amazon should know better after its error has been pointed out repeatedly. *Supra* at 1 nn. 2-3.[10]

Plaintiffs' expert confirms that obtaining testing documents is "straightforward" and "does ***not*** necessarily require disassembly of or destructive testing and forensic analysis of a product." Ex. 4 at 25 ¶15. The manufacturing process for this charger's cord often caused "mechanical damage" to the cord (which was the source of the spark); the defective cord was a common feature between the model Mr. Pickard purchased and the one identified in the negative customer reviews. Ex. 22 at 214-17; *see* Ex. 23 at 118-21; Ex. 3 at 2-3. Amazon's parade of horribles linked to a "duty to inspect for latent defects" (or to disassemble) simply attacks a theory that Plaintiffs do not assert. *See* Doc. #109-1 at 17-19. Summary judgment should be denied on this claim.

---

[10] To be sure, to comply with the expert requirements in Rule 702, Plaintiffs' experts dissembled the battery chargers to provide a reliable and complete opinion for litigation. But the existence of a defect was obvious based solely on a standard investigation and did not require disassembly. Ex. 4 at 20-25 ¶15. Again, all Amazon had to do was request testing documentation to uncover the defect. *Id.* at 12, 20-25 ¶¶11, 15; Ex. 14 at 133-37, 150-51 (Horn Dep.).

**III.    Amazon negligently performed its undertaking regarding product safety.**

Plaintiffs' negligent undertaking claim is simple: Amazon promised to take various actions regarding product safety and failed to do so responsibly, proximately causing Mr. Pickard's injury. The Court has already detailed much of the relevant evidence establishing the broad scope of Amazon's undertaking. Doc. #48 at 9-14; *see also* Doc. #96 at 11-13.

While Amazon remains wedded to its theory that "[v]oluntarily adopting safety processes should not be used as a basis to impose liability," Doc. #109-1 at 2, 21, this *per se* argument is now foreclosed by the Louisiana Supreme Court. It confirmed that Amazon "may be liable for injuries if, subject to standards established by this court's precedent, the operator assumed a duty to identify and remove unreasonably dangerous products from its marketplace." *Pickard*, 387 So. 3d at 517-18. Those standards come from "the Restatement of Torts Second, § 324A":

> One who undertakes . . . ***to render services to another which he should recognize as necessary for the protection of a third person***. . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if: . . .(c) the harm is suffered ***because of reliance of the other or the third person upon the undertaking***.

*Id.* at 524 (quoting Restatement (Second) of Torts § 324A (1965)) (emphasis added).

**A.    Amazon assumed a duty regarding product safety.**

As this Court and the Louisiana courts have recognized, Amazon undertook to (1) identify unsafe products sold on its website and (2) take appropriate remedial steps following certain triggering events. Doc. # 17 at 5; Doc. #96 at 11-12; Doc. #48 at 10-11; *Pickard*, 387 So. 3d at 526 (summarizing undertaking). The Court should easily conclude that a fact issue exists on this part of the undertaking test. *See Barnes v. Dresser, LLC*, No. 1:21-CV-00024, 2024 WL 3831141, at *5-6 (W.D. La. Aug. 14, 2024) (When there is a dispute about the "scope and extent of" an undertaking because a defendant tries to "downplay[] its role," the undertaking issue "must be determined by the trier of fact and may not be decided on summary judgment.").

### 1.    Amazon promised to investigate unsafe products.

The evidence demonstrates an "affirmative or positive undertaking" and establishes "the scope of [Amazon's] involvement." *Pickard*, 387 So. 3d at 525. Amazon claims that it "investigat[es] potentially unsafe products" so that it can take appropriate remedial steps up to "remov[ing] them from sale[.]" Ex. 6 at AMZ_PICKARD_00000325; *see* Doc. #48 at 10; Doc. #96 at 11-12. This undertaking begins before an unsafe product is listed on Amazon. Amazon requires that a third-party seller "must comply with all applicable laws, mandatory standards, and Amazon policies." Ex. 36 at AMZ_PICKARD_00000373. Amazon requires testing and "reserves the right to request additional compliance documents and information for [its] products" *Id.* Sellers utilizing Amazon's FBA program are told products that violate Amazon polices may be blocked for sale. Ex. 28 at 16. Some Restricted Products (like "electronics" and "batteries") are subject to a higher level of review. Ex 8 at AMZ_PICKARD_00000223-24; Exs. 10-12.

Amazon promises to vet sellers and their products. It tells the public that it engages in "new seller account vetting" and aims to "prevent suspicious, unsafe, or non-compliant products from being listed in our store." Ex. 1. Using "proprietary machine learning technology that stops bad actors before they can register or list a single product," Amazon publicly celebrates that it has "proactively blocked more than three billion suspect listings for various forms of abuse, including non-compliance, before they were published to [its] store." *Id.* Amazon's corporate representative testified about Amazon's thorough approval process to "ensure that there is nothing about [a] particular seller that would cause a risk to [Amazon's] buyers[.]" Ex. 2 at 27.

Those undertakings continue after a product is listed on Amazon. Amazon claims to "constantly monitor[] the information" it receives about product safety. *Id.* at 117. It encourages customers "to report listings that violate Amazon's policies," so that Amazon can "investigate each report thoroughly and take appropriate action." Ex. 8 at AMZ_PICKARD_00000224.

Amazon's corporate representative testified that it employed "a number of tools" "to monitor for safety signals from customers," including technology like "Heartbeat" and "Magnum PI" and other "processes for reviewing customer feedback[.]" Ex. 14 at 9-10. Amazon represents to the public that it "continuously scan[s] [its] product listings and updates to find products that might present a concern" and to "prevent suspicious, unsafe, or non-compliant products from being listed in our store." Ex. 1. Then, according to its corporate representative, its "investigators will actually do a further investigation beyond what our automated systems can do." Ex. 2 at 61-62.

Importantly, Amazon does ***not*** limit its investigation to the particular product with a negative customer review. Once Amazon receives a complaint about a product, its investigators "[c]heck reviews on related ASINs" (Amazon-specific numbers identifying a product). Ex. 6 at AMZ_PICKARD_00000332. After Amazon identifies all of the affected ASINs, it determines the "best course of action." *Id.* at 334; *see also* Ex. 13 at AMZ_PICKARD_00000359-60.

Amazon's corporate representative, in another case, confirmed that Amazon does not limit its safety investigation to only complaints associated with a particular ASIN, but seeks to identify safety issues with related products. *See Skaggs*, 334 So. 3d at 790-91; *see also* Doc. #48 at 13 ("[*Skaggs*] documented efforts undertaken by Amazon to uncover safety issues with similar products"). This Court, likewise, has already found that Amazon's Product Safety Team collects "[p]roduct safety concerns on similar products sold by other sellers of the same brand or seller," rejecting Amazon's previous efforts to narrow its undertaking. Doc. #48 at 10, 12-13.

These undertakings are not a secret. Amazon publicizes its "dedicated global team of compliance specialists that review submitted safety documentation" and its "qualification requirements that sellers must meet to offer products." Ex. 1. It has responded to media reports (like "a Wall Street Journal story about the safety of products offered") to reassure the public:

20

> [O]ur tools review the hundreds of millions of products, scan the more than five billion attempted daily changes to product detail pages, and analyze the tens of millions of customer reviews that are submitted weekly for signs of a concern and investigate accordingly. Our tools use natural language processing and machine learning, which means new information is fed into our tools daily so they can learn and constantly get better at proactively blocking suspicious products. . . . We invest significant resources to protect our customers and have built robust programs designed to ensure products offered for sale in our store are safe and compliant.

*Id.* ("constantly innovating"); *see also* Ex. 8 at AMZ_PICKARD_00000223-224; Ex. 14 at 34-37.

The existence of an undertaking to investigate unsafe products should be uncontroversial.

### 2. Amazon promised to take appropriate remedial action.

Once an unsafe product is identified, Amazon undertakes to conduct a "unique" investigation of each potentially unsafe product, "conducted in the most logical and fact-heavy way possible." Ex. 6 at AMZ_PICKARD_00000325, 334. Amazon "treat[s] seriously any risk of injury to customer health and investigate[s] each safety issue raised by customers." *Id.* at 325. It commits to use "diligence and learn more about the potential for concern to identify the best course of action." *Id.* at 326. "In most cases, [Amazon] will be reaching out to seller/vendor for testing documentation and certification or more information about the product." *Id.* at 333. Amazon then "analyze[s] all data points and information collected during the investigation." *Id.* at 334.

Amazon promises to take "appropriate" steps up to "remov[al] from sale if appropriate and necessary." *Id.* at 325; *see also id.* at 326, 331, 333-45; Ex. 7 at AMZ_PICKARD_00000161 ("remove[s] products"); Ex. 33 at 3-4 ¶11 (In another case, Amazon admitted that it "removed the product"). It has the right to "immediately suspend[] or terminat[e] selling privileges[.]" Ex. 8 at AMZ_PICKARD_00000223. In addition, Amazon may "trace and directly notify customers who purchased a particular product online and alert them to a potential safety issue." Ex. 1; *see also* Ex. 14 at 189-90; Ex. 9 at 3 (Amazon has the ability to "message customers advising them of the potential product safety defect").

Amazon all but admits this undertaking. *See* Doc. #109-1 at 7, 21 (Amazon "identifies and investigates product safety reports" and can "remove a product from the store or suspend a seller's privileges"). Similarly, its corporate representative admitted that Amazon "tell[s] customers" that it "weed[s] out unsafe products to protect the customer." Ex. 14 at 9. The Court has also discussed, in detail, the broad scope of Amazon's undertakings. Doc. #48 at 13 ("[*Skaggs*] documented efforts undertaken by Amazon to uncover safety issues with similar products [and] if an issue is identified, Amazon may remove a product from the store or suspend the seller"); *see id.* at 10-13 ("shows the actions Amazon can take" and Amazon "contemplates searches, at minimum, for similar products by other sellers of the same brand."); Doc. #96 at 11-12. Courts across the nation have held that these product safety services support an undertaking claim. *See, e.g.*, *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 427-28 (6th Cir. 2019); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 528 F. Supp. 3d 686, 698 (W.D. Ky. 2021).

The Louisiana Supreme Court recounted these undertakings and indicated that they posed "factual issues" that should be "reserved to the federal court." *Pickard*, 387 So. 3d at 526. Recognizing a fact issue as to the existence of an undertaking should not be controversial.

### 3. Amazon's arguments do not warrant summary judgment on this part of the negligent undertaking test.

To support its contention that this evidence "does not constitute an undertaking that can support Plaintiffs' claim," Amazon once again attacks a strawman, arguing that it did not undertake "to discover latent defects in the product that Pickard purchased" by "disassembl[ing] and inspect[ing] products." Doc. #109-1 at 20-21. This argument is easily rejected. Plaintiffs' claim is based on Amazon's documented "commitment to do something specific"—not an allegation that Amazon undertook to "disassemble products."[11]

---

[11] Similarly, Plaintiffs do not allege that Amazon undertook to "design" Jisell's products. *Cf.* Doc. #109-1 at 22.

This undertaking goes beyond "knowledge and expertise" or "[m]ere concern or minimal contact about safety matters." *Id.* at 21-22. If Amazon had responsibly performed its undertaking, this incident could have been avoided without disassembling the product. *See supra* at 15-16.

As a last gasp, Amazon tries to repackage its prior request for an Amazon-only exception to undertaking law by arguing that Louisiana law is "concerned about scalability" and the "practicality" of performing an undertaking. Doc. #109-1 at 22-24 ("Nobody does that"; "cannot possibly be scaled"); *see also* Amazon BOM at 18 ("no small task."), 20 ("practical problems"; "simply is not realistic"). This "too-big-to-fail" exception is misplaced—factually and legally.

Factually, Amazon's scalability concerns are contrary to the summary judgment evidence. All it needed to do was ask for testing documentation after learning of the similar battery charger's fire risks and remove all battery chargers identified in that documentation as similar that did not have compliant testing documentation—which is exactly what it ultimately did when it finally investigated the product after Mr. Pickard's death. *Supra* at 15-16.

Further, while Amazon cites *Bujol v. Entergy Services, Inc.*, 922 So. 2d 1113 (La. 2006), *Bujol* does not provide it a matter-of-law defense. Amazon cites a part of the opinion that found, on that record, that the defendant did not "assume a duty to act." *Id.* at 1134 ("witnesses explained why it would be impossible to impose the same safety factors"). Amazon is free to present evidence of such "impossibility" to the jury—defying all the evidence recounted above—and ask the jury to find it made no undertaking.[12] *Bujol* does not allow a defendant to avoid an undertaking duty by promising too much and then claiming, in litigation, that it cannot honor its promises.

---

[12] Amazon's undertaking is nothing like the evidence in *Bujol*. Unlike in *Bujol*, Amazon had "authority to remediate" the sale of a dangerous product. *Pickard*, 387 So. 3d at 525, because, as Amazon admits, it had "authority to suspend Jisell's access to Amazon's services and to decide what products can be sold on Amazon[.]" Doc. #109-1 at 22.

The Louisiana Supreme Court declined to recognize a scalability exception when Amazon asked for one. The Supreme Court simply said the "factual issue[]" of what Amazon undertook to do should be decided in this Court. *Pickard*, 387 So. 3d at 524-26. Because the facts are disputed, this Court should allow that issue to be resolved by the jury.

Finally, a duty analysis is conducted "at the categorical level not at the case specific level." FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., 1 LOUISIANA TORT LAW § 5.02 (2024). Thus, Amazon's scalability argument would require this Court to exempt an ***entire class*** of market participants from undertaking law. There is no reason to exempt all online retailers from ordinary tort law. If Amazon cannot responsibly perform its undertaking, it should not make such promises. The Louisiana Supreme Court declined to make any matter-of-law exception for Amazon and online retailers, and it is not the place of a federal court sitting in diversity to do so.

### B.    Mr. Pickard relied upon Amazon's undertaking.

The last element "requires the harm be suffered[13] because of reliance by the plaintiff" on the "undertaking[.]" *Pickard*, 387 So. 3d at 525 (quoting § 324A). Reasonable inferences from circumstantial evidence are sufficient to prove reliance. *See Hebert v. Rapides Par. Police Jury*, 974 So. 2d 635, 644 (La. 2008) ("preponderance of the evidence"). A fact issue exists on this issue, which Amazon tellingly cabins to a short discussion at the end of its brief. Doc. # 109-1 at 24-25.

Amazon engages in an extensive public relations campaign to encourage consumers to rely upon its product-safety services. Ex. 1. It tells its customers not "to worry about product safety." Ex. 16 at AMZ_PICKARD_00000221; *cf. Pickard*, 387 So. 3d at 525 ("underlying intent"). Its corporate representative acknowledged the obvious—that Amazon "expects" customers to rely upon its representations. Ex. 14 at 37; *see id.* at 8-10 ("that's what they tell customers").

---

[13] The harm is self-evident. Because of the defective battery charger that Mr. Pickard purchased as a result of his reliance upon Amazon's undertaking, a fire ignited at his home and caused his injuries. Ex. 3 at 3 (Meier).

As Plaintiffs' expert explains, Amazon "carefully" and "clearly designed" its much-hyped safety services "in the hopes that consumers will enhance their opinion of the platform's reliability," entrust it with their business," and "rely upon" those undertakings. Ex. 4 at 26-27 ¶16.

Consistent with Amazon's efforts to induce reliance, Mr. Pickard relied upon Amazon's undertakings because he "made purchasing decisions based on, Amazon's" promises regarding product safety, "forego[ing] other means of protecting" himself from dangerous products. Doc. #109-1 at 2-3, 24-25. Mr. Pickard's daughter testified that he "paid careful attention to product[s]" he purchased and "made an effort to make purchases from sources he trusted, such as Amazon[], rather than from stores or other websites because Amazon told its customers" that "the products it sold on its website were safe and met safety standards." Ex. 15 at 1. But for those assurances, Mr. Pickard "would not have purchased the battery charger from Amazon[.]" *Id.* Courts have relied on similar evidence in undertaking cases involving Amazon's product-safety services. *See Fox*, 930 F.3d at 427 (reliance was shown when a plaintiff "'had a habit' of reading emails" and "would not have let the [product] enter . . . her home had she known" the risk).[14] The Louisiana Supreme Court summarized this evidence and, without expressing any concern about its sufficiency, held that this claim posed a "factual issue[]." *Pickard*, 387 So. 3d at 526.

If Amazon says the truth is to be found, not in its publicized statements, but in the fine print of its "conditions" of service, Plaintiffs will look forward to having that discussion with the jury. Doc. #109-1 at 22. But there is plainly a fact issue for trial. *Cf. M. S.*, 2023 WL 8283642, at *4 ("Amazon cannot claim shock when a consumer does just" what it suggests in using a product).

### CONCLUSION AND PRAYER

The Court should deny Amazon's motion for summary judgment. *See* Doc. #109.

---

[14] The cases cited by Amazon had no such evidence of reliance. *Skaggs*, 334 So. 3d at 790-92 & n.7 (customer reviews ***post-dated*** the plaintiff's purchase); *Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir. 1998) ("no evidence").

Respectfully submitted,

MITHOFF LAW

 _/s/ Janie L. Jordan_
RICHARD WARREN MITHOFF
Admitted Pro Hac Vice
Texas State Bar No. 14228500
rmithoff@mithofflaw.com
JANIE L. JORDAN
Admitted Pro Hac Vice
Texas State Bar No. 11012700
jjordan@mithofflaw.com
Penthouse, One Allen Center
500 Dallas, Suite 3450
Houston, Texas 77002
Tel: (713) 654-1122  /  Fax:  (713) 739-8085

CHARLES E. TABOR
ATTORNEY AT LAW, LLC

 _/s/ Charles E. Tabor_
CHARLES E. TABOR
LA Bar Roll No. 31984
Charles@charlestaborlaw.com
670 Albemarle Dr. Set 301
Shreveport, LA  71106
Tel: (318) 963-0953  / Fax:  (318) 582-1245

BECK REDDEN LLP

_/s/ Nicholas M. Bruno_
NICHOLAS M. BRUNO
Admitted Pro Hac Vice
Texas State Bar No. 24097432
nbruno@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been served on all counsel of record through the Court's CM/ECF filing system on September 23, 2024.

 _/s/ Nicholas M. Bruno_
NICHOLAS M. BRUNO

26