UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

**ANGELA PICKARD, ET AL**            **CIVIL DOCKET NO. 5:20-cv-01448**

**VERSUS**                           **JUDGE DAVID C. JOSEPH**

**AMAZON.COM, INC., ET AL**          **MAGISTRATE JUDGE KAYLA D. MCCLUSKY**

## MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") [Doc. 109] filed by Amazon.com, Inc. (hereinafter, "Amazon").[1]  Plaintiffs, the children of decedent Archie Pickard,[2] oppose the Motion, [Doc. 112], and Amazon filed a Reply brief. [Doc. 117].  For the following reasons, Amazon's Motion is GRANTED IN PART and DENIED IN PART.

## FACTUAL BACKGROUND

This lawsuit arises out of the death of Archie Pickard after a lithium-ion battery charger he purchased on Amazon's website caught fire in his home, destroying the house and causing fatal burns to Mr. Pickard.  On December 15, 2019, Mr. Pickard purchased a "18650 Rechargeable Li-ion Battery Charger 4 Slot Universal Smart Li-ion Battery Charger" on Amazon's website.  [Doc. 17].  At the

---

[1]    Per Plaintiffs' First Amended Complaint filed on December 21, 2020, [Doc. 13], the following Defendants have been terminated: Amazon.com, LLC; Amazon.com Services LLC, Amazon.com Services LLC, formerly known as Amazon.com Services, Inc., Amazon.com Services, Inc., Amazon.com Services, Inc., formerly known as Amazon Fulfillment Services, Inc., Amazon Fulfillment Services, Inc., and Amazon.com Sales, Inc.

[2]    The Plaintiffs in this matter are Angela Pickard, Individually and as Executor of the Estate of Archie Pickard, deceased; Dustin Pickard; Wendy Elmore; Joni Thompson; and Wayne Pickard (hereinafter, "Plaintiffs").

time of the purchase, a small notation beneath the Amazon product listing stated that the charger was "sold by" a third-party company named "Jisell," a foreign manufacturer based in Shang Hai, China.[3]  [Doc. 17, ¶ 29].

Products sold on Amazon's website – www.amazon.com – include: (i) products sold by Amazon as the retailer, and (ii) products sold by over a million "third-party sellers."  *See* [Doc. 109-11, ¶ 6, Affidavit of Andy Sachs, Amazon Senior Manager of Risk & Policy].  The responsibilities of these third-party sellers include, *inter alia*, setting their own prices and describing their own products.  But to list products on the Amazon website, third-party sellers must create a seller account and agree to the terms of the *Amazon Services Business Solutions Agreement* ("BSA").  *Id.* at ¶ 8.  The BSA requires third-party sellers to provide information regarding their products, including description, price, and any required labels and warnings.  *Id.* at ¶ 10(b). The BSA also requires that third-party sellers accept responsibility for importing and ensuring that their products are properly packaged and comport with all applicable laws.  *Id.* at ¶ 10(d)(f).

As required to list its products on Amazon, Jisell had previously agreed to Amazon's BSA.  *Id.* at ¶ 8.  Similarly, as a condition of using the Amazon website to make a purchase, Amazon required Mr. Pickard to agree to its *Conditions of Use*,

---

[3]    "According to the 'Detailed Seller Information' on Amazon's website, Jisell is the fictious or 'friendly' name for "Shang Hai Ji Xiao Dian Zi Ke Ji You Xian Gong Si," a Chinese company whose business address is Feng Xian Qu Hai Wan Zhen Wu Si Gong Lu, 4399 Hao 37 Dong 107, Shang Hai 201499."  [Doc. 17, ¶ 29].  However, there appears to be a factual dispute regarding whether Jisell, or another company Chinese company,  Guangzhou Shangtuomaoyi Co. Ltd., actually manufactured the subject battery charger.  [Doc. 109-11, p.3, n.1].  For purposes of ruling on this Motion, the Court assumes that Jisell manufactured the battery charger as has been alleged in Plaintiffs' Complaint.  [Doc. 17].

wherein Amazon declares that the only "warranty" covering consumer purchases from a third-party seller comes from that third-party seller.  [Doc. 109-14, pp. 5-6].

Amazon organizes products on its website by specialized numbers called Amazon Standard Identification Numbers ("ASIN").  [Doc. 109-11, ¶ 5(a)].  The product listing for the battery charger purchased by Mr. Pickard included the ASIN for that product: ASIN B07PGTHXCT.  *Id.*  Amazon also maintains a Product Safety Team that monitors customer reviews and other data sources to identify potential product safety issues.  *See* [Doc. 109-15, ¶ 5, Declaration of John Horn, Amazon Manager, Safety Controls, Product Safety and Compliance].  At its discretion, the Product Safety Team can remove products that may pose safety issues.  *Id.*

In addition to its use of Amazon's website and payment system to sell its products, Jisell also utilized Amazon's optional Fulfillment by Amazon ("FBA") storage and logistics services to fulfill Mr. Pickard's order.  [Doc. 109-11, ¶ 15]. Amazon's FBA program allows third-party sellers to send inventory to Amazon's fulfillment centers for storage and subsequent delivery.  *Id.*  Under the FBA program, when a consumer places an order for a third-party seller's product, Amazon retrieves the pre-packaged product from its warehouse, places the product in a shipping container or applies a shipping label to the product's box, and delivers or arranges delivery of the product to the buyer.  *Id.*  Thus, under the FBA program, a third-party seller merely provides a product, a product description, and a price to Amazon. Amazon then provides its website platform and marketing, physically stores the product in its warehouses, receives payment on behalf of the third-party, and

ultimately delivers possession of the product to customers. In exchange for its services to the third-party seller, Amazon receives a service fee. *Id.* at ¶ 18. Although the Jisell battery charger was stored at an Amazon fulfillment center, Jisell never transferred ownership of the battery charger to Amazon. *Id.* at ¶ 17.

Prior to the sale of the battery charger to Mr. Pickard on December 15, 2019, Jisell had sent the battery charger to Amazon's fulfillment center in San Marcos, Texas, for storage and delivery in the event the product was purchased. [Doc. 109-11, ¶ 15(b)]. When Mr. Pickard ordered the battery charger, Amazon retrieved the charger from its warehouse and shipped it to Mr. Pickard. *Id.* At the time of Mr. Pickard's purchase, there were no safety-related reviews or reports for the ASIN assigned to the Jisell four-slot battery charger. [Doc. 109-15, ¶ 6]. However, there were three negative consumer safety reviews on a similar six-slot battery charger, which bore a different ASIN, but was also manufactured and "sold by" Jisell. [Doc. 112-1, p. 11]. In the early morning hours of December 21, 2019, a house fire, allegedly caused by a defect in the Jisell battery charger, ravaged Mr. Pickard's home in Shreveport, Louisiana. As a result of the fire, Mr. Pickard suffered severe burn wounds and died from his injuries.

## PROCEDURAL HISTORY AND CERTIFIED QUESTIONS

Plaintiffs filed their wrongful death and survival action in this Court in November 2020, alleging that Amazon is liable for the allegedly defective four-slot battery charger under three different theories: (i) manufacturer-seller liability under the Louisiana Products Liability Act, La. R.S. § 9:2800.51, *et seq.*, ("LPLA"); and the

tort-based claims of: (ii) non-manufacturer seller liability; and (iii) negligent undertaking.

In a previously filed Motion for Summary Judgment, Amazon sought dismissal of all Plaintiffs' claims arguing, generally: (i) that Amazon was neither the seller nor the manufacturer of the battery charger; and (ii) that Plaintiffs cannot establish the elements of their negligent undertaking claim. [Doc. 59].

Given the dearth of Louisiana caselaw applying either the LPLA or the tort-based theory of negligent undertaking to products sold on a web-based marketplace platform, the Court *sua sponte* certified the following questions to the Louisiana Supreme Court:

(1)    Under Louisiana products-liability law, is the operator of an online marketplace a "seller" of third-party products sold in its marketplace when the operator did not hold title to the product but: (i) had physical custody of the product in its distribution warehouse; and (ii) controlled the process of the transaction and delivery through its product fulfillment program?

(2)    Under what circumstances, if any, would the operator of an online marketplace who voluntarily adopts safety procedures for the products sold through its website by third-party sellers, be liable for injuries sustained by the purchaser of a defective product based on a theory of negligent undertaking?

[Doc. 96]. The Louisiana Supreme Court granted certification, *Pickard v. Amazon.com, Inc.*, 379 So. 3d 19 (La. 2024), and answered the certified questions on June 28, 2024. *Pickard v. Amazon.com, Inc.*, 387 So. 3d 515 (La. 2024).

As to the first certified question, the Louisiana Supreme Court began by setting forth the applicable LPLA statutory framework. The LPLA only applies to manufacturers. *Id.* at 518, *citing* La. R.S. § 9:2800.52. However, under the LPLA, a

manufacturer includes "[a] seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer. *Id.* at 519, *citing* La. R.S. § 9:2800.53(1)(d). Further, the LPLA defines "seller" as a person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value. *Id., citing* La. R.S. § 9:2800.53(2).

Analyzing Amazon's alleged "seller" status within the context of Subsection 9:2800.53(1)(d), the court stressed that the purpose of this subsection is to ensure that when an alien manufacturer may not be subject to service of process or is immune from enforcement of a judgment, "the seller-importer or seller-distributor who is the alien manufacturer's alter ego should bear the loss, not the consumer plaintiff." *Pickard*, 387 So. 3d at 520, *citing* John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L. REV. 565, 575-76 (1989).[4] *See also Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.*, 262 So. 2d 377 (1972) (pre-LPLA redhibition case that served as a basis for crafting the manufacturer-seller classification in the LPLA). Turning to the text of the LPLA, the Louisiana Supreme Court, using a dictionary, determined that the common and approved usage of the word "possession" as it is used in the LPLA definition of "seller" means the "physical custody and control of the product, without regard to ownership." *Pickard*, 387 So. 3d at 520-21.

---

[4]    Senator John N. Kennedy was a drafter of the LPLA.

Accordingly, after careful consideration of the purpose of the LPLA, the legislative history of the statute, and the language used by the Louisiana Legislature in enacting the statute, the Louisiana Supreme Court answered the first certified question as follows: "Under the [LPLA], the operator of an online marketplace is a 'seller' of third-party products sold in its marketplace when the operator did not hold title to the product but: (i) had physical custody of the product in its distribution warehouse; and (ii) controlled the process of the transaction and delivery through its product fulfillment program." *Pickard*, 387 So. 3d at 523.[5]

In answering the second certified question, the court focused on *Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1128-29 (La. 2004), *adhered to on reh'g* (La. 2006), calling the decision the "definitive Louisiana analysis of Section 324A of the Restatement of Torts Second," and finding the standards set forth therein apply "to determine if an operator of an online marketplace assumed a duty owed by a third-party seller and is liable for any damages caused by the breach of that duty." *Pickard*, 387 So. 3d at 526. The court did not speculate about "what circumstances may trigger liability under Section 324A when the operator of an online marketplace voluntarily adopts safety procedures" and specifically explained that "[a]ny fact-finding responsibility is reserved to the federal court." *Id.*

---

[5]     In so holding, the court factually distinguished *Skaggs v. Amazon.com, Inc.,* 334 So. 3d 780 (La. App. 1st Cir. 2021), *writ denied*, 333 So. 3d 1243 (La. 2022), finding that, in *Skaggs*, Amazon was not a seller within the meaning of the LPLA because the product was shipped directly from the seller to the buyer. *Pickard*, 387 So. 3d at 523.

With the foregoing clarification from the Louisiana Supreme Court, this Court permitted Amazon to file a second dispositive motion, which Amazon filed on August 16, 2024, again seeking summary judgment dismissing all claims. [Doc. 109]. All briefing on that Motion having now been completed, the Motion is ripe for review.

### SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant can show that "there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As such, the party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact as to issues critical to trial that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.*, *citing Celotex*, 477 U.S. at 323. In evaluating motions for summary judgment, the court

must view all facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  There is no genuine issue for trial – and thus a grant of summary judgment is warranted – when the record as a whole "could not lead a rational trier of fact to find for the non-moving party[.]"  *Id.*

## LAW AND DISCUSSION

### I.   Louisiana Products Liability Act

Under Louisiana law, the LPLA establishes the "exclusive theories of liability for manufacturers for damage caused by their products."  La. R.S. § 9:2800.53.  "A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in [the LPLA]."  *Id.*  As discussed above, the LPLA defines "manufacturer" as including, "[a] seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer."  *Id.* § (1)(d).  In determining whether a seller is the alter ego of an alien manufacturer, the LPLA directs courts to take into consideration: (i) "whether the seller is affiliated with the alien manufacturer by way of common ownership or control;" (ii) "whether the seller assumes or administers product warranty obligations of the alien manufacturer;" (iii) whether the seller prepares or modifies the product for distribution;" or (iv) "any other relevant evidence."  *Id.*

Here, Plaintiffs contend that Amazon is a "manufacturer-seller" as defined in the LPLA.  To satisfy this standard, Amazon must first be classified as a "seller."

Applying the Louisiana Supreme Court's guidance in *Pickard* to the undisputed facts of the battery charger sale at issue, this Court concludes as a matter of law that Amazon is a "seller" for purposes of the LPLA. 387 So. 3d at 523.

The Court's next task then is to determine whether the record contains material disputes of fact as to: (i) whether Amazon is in the business of importing or distributing the subject Jisell battery charger for resale; and (ii) whether Amazon can be considered the "alter ego" of Jisell using the statutory factors listed in La. R.S. § 9:2800.53(1)(d).  The Court addresses each issue in turn.

## A.    Is Amazon in the Business of Importing or Distributing the Battery Charger for Resale?

In arguing that it was not a "distributor" of the battery charger, Amazon turns to the same argument it made when contending it was not a "seller" under the LPLA – specifically, that it cannot be a "distributor" of the battery charger because it neither held nor transferred title to the product.  [Doc. 109-1, p. 15].  Unlike the term "seller," however, neither the LPLA nor Louisiana jurisprudence interpreting the LPLA define the word "distributor," and the parties offer competing definitions of the term. Amazon cites an out-of-date edition of Black's Law Dictionary, which defines a "distributor" as a "wholesaler, jobber, or other manufacturer or supplier that sells chiefly to retailers and commercial users," BLACK'S LAW DICTIONARY (11th ed. 2019), while Plaintiffs offer the Merriam-Webster definition of "distributor," which includes to "deliver" or "disperse."  MERRIAM-WEBSTER DICTIONARY (11th ed. 2024).

Because no Louisiana Supreme Court decision answers this question, the Court must proffer an *Erie* guess as to how the Louisiana Supreme Court would rule.

*SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 436 (5th Cir. 2008).  In so doing, the Court's "task is to attempt to predict state law, not to create or modify it." *Id.* at 442, *quoting Herrmann Holdings, Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 558 (5th Cir. 2002).  Significantly, when making an *Erie* guess regarding Louisiana law, federal courts must abide by and honor Louisiana's unique civilian tradition.  In this fashion, federal courts must first examine the primary sources of law: the constitution, codes, and statutes; jurisprudence serves only as a secondary source.  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

The question before this Court is one of statutory interpretation, which is a question of law.  *Carollo v. Dep't of Transp. & Dev.*, 346 So. 3d 751, 759 (La. 2022), *citing Red Stick Studio Development, L.L.C. v. State ex rel Dept. of Econ. Dev.*, 56 So. 3d 181, 187 (La. 2011).  The fundamental question in statutory construction cases is legislative intent.  *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So. 2d 294, 302 (La. 2001), *citing Succession of Boyter*, 756 So. 2d 1122, 1128 (La. 2000).  Examining the language of the statute itself serves as the starting point of statutory interpretation. *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 998 So. 2d 16, 26-27 (La. 2008).

When a law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. Civ. Code art. 9; La. R.S. § 1:4.  However, "[w]hen the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole."  La. Civ. Code art. 12.  Also, when a law is susceptible of different meanings, "it must be

interpreted as having the meaning that best conforms to the purpose of the law." La. Civ. Code art. 10.

According to La. R.S. § 1:3, "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." To obtain the plain meaning and common usage of undefined words in a statute, dictionaries serve as a valuable resource. *Pickard*, 387 So. 3d at 520, *citing Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959, 964 (La. 2003).

After careful consideration of the parties' arguments and the governing jurisprudence, the Court finds that a manufacturer-seller under the LPLA need not take title to the product in question to be considered the product's "distributor." This is true for three reasons. First, there is nothing in the text of the LPLA that supports a deviation from the general rule that words should be given their generally prevailing meaning. La. R.S. § 1:3. The use of the word "distributor" within the context of the LPLA does not involve a technical matter, nor is there anything within the LPLA that suggests the word has acquired a peculiar meaning in the law. *Id.* *See also* La. R.S. § 1:3. Further, although the LPLA provides specific, technical definitions for terms like "damage," "express warranty," and "reasonably anticipated use," it notably does not define the word "distributor." This Court therefore finds that

if the Louisiana Legislature had intended to give "distributor" a technical meaning, it would have done so.[6]

It is equally clear that the generally accepted meaning of the word "distributor" does not require that a "distributor" have ownership of the object being distributed. For instance, Merriam-Webster's definition of "distributor" is "one that distributes" and "one that markets a commodity." MERRIAM-WEBSTER (11th ed. 2024). Merriam-Webster defines "distribute" as "to divide among several or many . . . to give out or deliver especially to members of a group[.]" *Id*. And the current version of Black's Law Dictionary defines "distribute" similarly.[7] These definitions are, of course, inclusive of situations where a distributor takes title to a product. But nowhere does the definition *require* title or ownership to be a distributor.

Second, the purpose of the LPLA, as set forth in its legislative history, supports a broad interpretation of the word "distributor." For instance, a prior legislative draft of the manufacturer-seller definition in La. R.S. § 9:2800.53(1)(d) required the alien manufacturer to be insolvent or bankrupt for a plaintiff to recover against a "seller-manufacturer." S.B. 684, 1988 Reg. Sess. (La. 1988). However, this language was removed after a Louisiana Senate Judiciary Committee meeting that included testimony urging that, "at least to the Louisiana citizen who buys a foreign product,

---

[6]    This finding is consistent with the Louisiana Supreme Court's answer to the certified question in this matter, where it chose to use the general, non-technical definition of "possession." Both "distributing" and "possession" are found in the same section of the Louisiana Revised Statues. *See* La. R.S. § 2800.53.

[7]    BLACK'S LAW DICTIONARY (12th ed. 2024) ("distribute:" "1. To apportion; to divide among several. 2. To arrange by class or order. 3. To deliver. 4. To spread out; to disperse.").

he ought not to be required to go to China to collect his judgment." Minutes of Comm. on Jud. A, La. Senate, May 17, 1988, p. 10. Thus, the legislative history supports a broad reading of the word "distributor" to meet the underlying goal of allowing recovery for Louisiana consumers harmed by a defective product manufactured by foreign companies.

To this point, as referenced by the Louisiana Supreme Court in *Pickard*, a law review article written shortly after the LPLA's passage by current United States Senator John N. Kennedy, a drafter and proponent of the LPLA, explained the purpose of the manufacturer-seller provision as follows:

> [A] seller may be the only defendant available to the plaintiff if the alien manufacturer, because of his foreign status, is not subject to service of process or is immune from enforcement of a judgment. In those circumstances the seller-importer or seller-distributor who is the alien manufacturer's alter ego should bear the loss, not the consumer plaintiff.

387 So. 3d at 520, *citing* Kennedy, 49 LA. L. REV. 565, 575-76 (footnotes omitted).

Third, the Court's interpretation of "distributor" is consistent with the rationale used by the Louisiana Supreme Court in answering this Court's certified questions. Specifically, the Louisiana Supreme Court stated that an operator of an online marketplace, such as Amazon, should bear the loss for injury caused by a defective product if it is the alter-ego of a foreign manufacturer. *Pickard*, 378 So. 3d at 520. In doing so, the court compared an operator of an online marketplace – here, Amazon – to the *distributor* in *Media Production Consultants, Inc.,* 262 So. 2d 377

(La. 1972),[8] stating that in this factual circumstance, the operator's "involvement can form a substantial and material part of the transaction . . . like the distributor in *Media Production*." *Id.* Thus, the Louisiana Supreme Court implicitly referenced Amazon as a "distributor." On the other hand, were the Court to adopt Amazon's proffered definition of "distributor" as requiring ownership, it would render meaningless the portion of the Louisiana Supreme Court's opinion stating the conditions on which Amazon could be considered an alter ego of the manufacturer. *Pickard*, 378 So. 3d at 520. Therefore, the use of the generally prevailing and less restrictive definition of "distributor" is supported by Louisiana's highest court in this very case.

Considering the foregoing,[9] this Court interprets "distributor" in La. R.S. § 9:2800.53(1)(d) to mean an entity that "gives out" or "delivers" a product, regardless

---

[8]     "In *Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.*, which predated the adoption of the Products Liability Act, this court found a domestic distributor of a foreign automobile manufacturer to be a manufacturer for purposes of redhibition. In addition to marketing the vehicles, the domestic distributor inspected, adjusted, and prepared the automobiles for sale and delivery to dealerships." *Pickard*, 387 So. 3d at 520 (citations omitted).

[9]     For largely the same reason, this Court rejects Amazon's argument that the phrase "for resale" in La. R.S. § 9:2800.53(1)(d) precludes Amazon from being a distributor under the LPLA. Reading the LPLA in *pari materia*, it is clear that the word "resale" simply refers to the sale of a foreign manufactured product in Louisiana by a domestic "importer" or "distributor" of that product. It is undisputed that online retailers, like Amazon, transact the sale of goods to customers in the United States. And, of course, the Louisiana Supreme Court has already told us the Amazon was a "seller" of the subject battery charger under the facts of this case. While it is undisputed that no sale took place between Jisell and Amazon because title was never transferred, allowing the language "for resale" to prevent liability for the operator of an online marketplace like Amazon is inconsistent with the Act's legislative purpose and Louisiana's highest court's most recent opinion on this issue.

of whether it holds and transfers title. Considering the summary judgment evidence presented, Amazon clearly meets this definition of a "distributor."[10]

**B.    Is Amazon the Alter Ego of Jisell for Purposes of Seller-Manufacturer Liability under the LPLA?**

Next, the Court considers whether summary judgment is appropriate on Plaintiffs' claim that Amazon is Jisell's alter ego for purposes of the LPLA. La. R.S. § 9:2800.53(1)(d) provides four factors to apply in determining if a domestic seller is the alter ego of an alien manufacturer: (i) "whether the seller is affiliated with the alien manufacturer by way of common ownership or control;" (ii) "whether the seller assumes or administers product warranty obligations of the alien manufacturer;" (iii) "whether the seller prepares or modifies the product for distribution;" and (iv) "any other relevant evidence." La. R.S. § 9:2800.53(1)(d). While other federal district courts appear to be divided on this issue,[11] the Court finds that this inquiry presents

---

[10]    *See* [Doc. 109-11, p. 6] ("Amazon retrieved the battery charger from Jisell's inventory and handed it to UPS for delivery to the shipping address designated by Mr. Pickard."). *See also* [Doc. 112-41, p. 10] ("Through its FBA program, Amazon picked, packed, labeled, shipped, and distributed the battery charger to Mr. Pickard."). *See also* [Doc. 112-28, p. 19] ("As part of our fulfillment services, we will ship Units from our Inventory of Your Products to the shipping addresses.").

[11]    *See Performance Contractors, Inc. v. Great Plains Stainless, Inc.*, 2012 WL 5398534, at *7 (M.D. La. Nov. 2, 2012) ("Accordingly, no reasonable juror could find that Great Plains is a manufacturer as Zhejiang Jndia's alter ego. As a matter of law, Great Plains is therefore not a manufacturer under the alter ego definition."). *Contra Stone Energy Corp. v. Nippon Steel,* 475 F.Supp.3d 563, 569 (W.D. La. 2020) ("The statute appears to direct the Court to take on the fact intensive inquiry of whether sellers are 'alter-ego manufacturers.'"). But the Court also notes that while *Stone* appears to categorize the alter ego issue as a question of law, it still applied the federal summary judgment standard to the outcome. *Id.* ("Because the parties also raise the issue of alter ego, the Court will address this definition of manufacturer even though issues of fact preclude summary judgment on the 'control and influence' definition.").

a mixed question of law and fact.  Accordingly, under the federal summary judgment standard, the resolution of the alter ego issue must be determined by a jury if there are material factual disputes relevant to the application of these factors.[12]

The Court would note that this view is also in accordance with the legislative history of the LPLA.  LSU Law Professor Tom Galligan, who testified before the state legislature during the drafting of the LPLA, expressed the same belief shortly after the LPLA's passage: "In Louisiana[,] the alter ego issue is a question of fact."  Tom Galligan, *The Louisiana Products Liability Act: Making Sense of it All*, 49 LA. L. REV. 629, 633, n.24 (1989).

But the Court is faced with a difficult task in applying this standard: it must retrofit the modern world of e-commerce to the statutory framework of the LPLA, which was enacted in 1988 and has not since been amended.  Adding complexity is the fact that while the LPLA provides four factors to consider in the alter ego analysis, Louisiana law does not speak to the weight that should be given to each factor.

---

[12]     A mixed question of law and fact involves the "application of legal standard[s] to a particular set of facts."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S. Ct. 2126, 48 L.Ed.2d 757 (1976).  Under this standard, if the Court finds that reasonable persons could draw different conclusions when applying the alter ego factors to the evidence in the record, summary judgment is not appropriate.  *See, e.g., Newcomb v. N. E. Ins. Co.*, 721 F.2d 1016, 1019 (5th Cir. 1983). In *Newcomb*, the Fifth Circuit, applying Louisiana law, held that because "reasonable and fair-minded persons could differ as to the conclusions to be drawn from" the factors used in determining if an employment relationship existed, that issue presented a mixed question of law and fact, and summary judgment was inappropriate. *Id.* (where the factors were, "the degree of control exercised by the alleged employer, the nature of the contract between the parties, and the extent to which the parties are economically interdependent.").  Similarly, in the business associations context, the determination of "alter ego" status for the purpose of piercing the corporate veil is clearly a question of fact reserved for the jury.  *See Holly & Smith Architects, Inc. v. St. Helena Congregate Facility*, 872 So. 2d 1147, 1155 (La. App. 1st Cir. 2004).  Thus, in this context, summary judgment is only appropriate when reasonable minds could not differ on the answer to the mixed question.

Considering the foregoing, the Court finds the "fourth" factor – "any other relevant evidence" – to be particularly important to the case at hand.  By including this fourth "factor," the LPLA provides an avenue for a factfinder to consider the realities of the modern marketplace in determining whether a domestic distributor acts as an alter ego of a foreign manufacturer.  The Court will discuss each factor in turn.

### 1.    Is Amazon Affiliated with Jisell by Way of Common Ownership or Control?

The first factor in determining if Amazon is the alter ego of Jisell is "whether the seller is affiliated with the alien manufacturer by way of common ownership or control."  La. R.S. Ann. § 9:2800.53(1)(d).  In its Motion, Amazon points to the BSA which provides that both parties are independent contractors and "nothing in [the] Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between" the parties.  [Doc. 109-13, p. 5].  Further, Amazon states that third-party sellers are free to terminate their use of Amazon at any time, can sell their products through other channels, and retain complete authority over how and where they sell their products.  *Id.*  In opposition, Plaintiffs argue that Amazon controlled nearly every aspect of the sale through the

FBA program, citing heavily to an article published in the Yale Journal of Law & Technology[13] and the BSA.[14]

In support of its Motion disclaiming any ownership or control of Jisell, Amazon merely provides an affidavit broadly stating that, "Amazon is not affiliated with third-party sellers by way of common ownership or control." [Doc. 109-11, p. 7]. But Amazon has failed to provide any specific evidence relevant to either issue. While Amazon provides its independent contractor agreement with Jisell [Doc. 109-13], this is merely a contract between the parties and does not reflect either company's ownership structure. There is otherwise nothing in the record showing, for example, that Amazon does not own any shares or stock in Jisell.

---

[13]     *See* Edward Janger & Aaron Twerski, *Functional Tort Principles for Internet Platforms: Duty, Relationship, and Control*, 26 YALE J.L. & TECH. 1, 30, 32, 49-50, 54 (2023) ("Amazon determines the ability of third-party vendors to communicate with Amazon customers without its permission[;] Amazon controls how the consumer learns the seller's identity and does so quietly[;] Payments for all sales made on Amazon are made to Amazon, not to the third-party seller[;] Amazon provides all customers who purchase on its website, including purchases from third-party vendors, an 'A-to-Z Guarantee' that covers defective products[;] By guaranteeing satisfaction and an open return policy, Amazon communicates to the consumer that Amazon is in charge of the transaction[;] When a single product is offered by multiple sellers, Amazon determines which seller will get the first chance to sell the product as a 'Featured Offer.'[;] It may 'commingle Units' from multiple third-party sellers, leaving a buyer without knowledge of which party the product originated from[;] Once an item is sent to one of Amazon's fulfillment centers, the seller never touches it again.").

[14]     *See* [Doc. 112-28, *Selling on Amazon Service Terms,* § S-6]; *Id.* at *General Terms,* § 2, ¶ 1] ("You will use only a name you are authorized to use[.]"); *Id.* at *Selling on Amazon Service Terms,* § S-1.2 (Amazon will "receive all sales proceeds[.]"); *Id.* at § S-3; *Id.* at *Fulfillment by Amazon Terms,* § F-4; *Id.* at § F-4 to F-10.

More importantly, however, is the issue of control.  It is well-known that Amazon is one of the largest and most powerful retailers in the world,[15] illustrating its capacity to exercise an inordinate level of control over its third-party sellers.[16]

The summary judgment evidence in this case shows that Amazon exercises control over third-party sellers in several ways.  First, Amazon mandates the parameters of what third-party sellers must do to use its platform, as shown in the BSA agreement.  *See* [Doc. 109-13] ("[T]his Amazon services business solutions agreement contain the terms and conditions that govern your access to and use of the services[.]").  Further, as cited by Plaintiffs in their opposition brief, examples of how Amazon controls entities like Jisell include "determin[ing] and approv[ing] the content, appearance, design and described functionality of any product that it puts on its online platform" and accepting payments directly for all sales made on its platform.  [Doc. 112-1, p. 17], *citing* Janger & Twerski, 26 YALE J.L. & TECH. 28, 30 (2023).

Second, Amazon exercises control by virtue of retailers' reliance on its platform to market and sell their goods.  Here, Amazon has not presented the Court with any evidence regarding the percentage of Jisell's domestic sales that occur through Amazon's platform.  If, for instance, ninety five percent of Jisell's sales occur through

---

[15]    *See* Cally Russell, *Who Are the 10 Biggest Retailers in the World,* FORBES (Dec. 10, 2021),  https://www.forbes.com/sites/callyrussell/2020/01/09/who-are-the-10-biggest-retailers-in-the-world/ (Amazon is "[t]he top online retailer globally with $213bn in revenue.").

[16]    *See* Michael Totty*, Amazon (and Other Platforms) vs. Third-Party Sellers: Complicated Debate*, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (May 10, 2023) ("There's no denying that platforms such as Amazon hold sway over third-party sellers[.]").

Amazon, this would suggest that Amazon has a considerable amount of control over Jisell. Amazon corporate representative Andy Sachs explained in his deposition that Jisell is "registered to sell in [Amazon's] Mexico, Canada, and U.S. Stores." [Doc. 112-3, p. 29]. If Jisell relies primarily on Amazon's platform to sell goods to the entire North American market, this would indicate a high level of control by Amazon over Jisell. If Amazon no longer allowed Jisell to use its platform to sell goods, then presumably Jisell would suffer significant financial consequence.

As discussed above, Amazon's Motion suggests that it does not control Jisell because third-party sellers are free to terminate their use of the Amazon platform at any time, can sell their products through other channels, and retain complete authority over how and where they sell their products. [Doc. 109-13, p. 5]. While this is certainly relevant evidence that can be presented to the jury, the Court will not cabin the issue of Amazon's control of Jisell to these factors alone. Because nothing suggests that the legislature intended to use a technical definition of "control," the Court again looks to the dictionary, which defines "control" as "to exercise restraining or directing influence over . . . to have power over." MERRIAM-WEBSTER (11th ed. 2024).[17] This definition clearly encompasses more than the literal, concrete type of control posited by Amazon.

---

[17]    In *Pickard*, the Louisiana Supreme Court utilized Merriam-Webster to obtain the generally prevailing meaning of the word "possession." *Pickard*, 387 So. 3d at 520. The Court notes that the definition of "control" from Black's Law Dictionary echoes the Merriam-Webster definition. Black's Law Dictionary defines control as "to exercise power or influence over" and "to have a controlling interest in." BLACK'S LAW DICTIONARY (12th ed. 2024).

Here, given the factors cited by the Court, there is a genuine dispute of material fact with respect to the amount of control exercised by Amazon over Jisell. This issue must be resolved by the finder of fact.

### 2. Did Amazon Assume or Administer the Product Warranty Obligations of Jisell?

Next, the Court must consider "whether the seller assumes or administers product warranty obligations of the alien manufacturer." La. R.S. § 9:2800.53(1)(d). In arguing that it does not assume the product warranty obligations of Jisell, Amazon relies on its *Conditions of Use*, which expressly states that Amazon does not warrant the products of third parties.[18]  Amazon also proffers the deposition testimony of corporate representative Andy Sachs, who testified that "Amazon handles any returns pursuant to our return policies.  Any warranty that a buyer may want to leverage, it's possible that also overlaps with our return policies, but any returns or exchanges we would make are pursuant to our policies.  It is not dependent upon or pursuant to a manufacturer or seller-issued warranty." [Doc. 112-3, p. 49].

In response, Plaintiffs point to specific language in the BSA, arguing that by virtue of its contractual relationships, Amazon actually does administer, or pass on, the warranties of its third-party sellers to buyers when it accepts product returns:

> **S-2.2** Amazon Refund Policies for the applicable Amazon Site will apply to Your Products. Subject to Section F-6. for any of Your Products fulfilled using Fulfillment by Amazon, you will promptly accept,

---

[18]     Amazon's *Conditions of Use* states: "We are not responsible for examining or evaluating, and we do not warrant, the offerings of any [third-party] businesses or individuals (including the content of their Web sites).  Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties." [Doc. 109-14, p. 5].

calculate, and process cancellations, returns, refunds, and adjustments in accordance with this Agreement and the Amazon Refund Policies for the applicable Amazon Site, using functionality we enable for your account. Without limiting your obligations, we may in our sole discretion accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers. You will route any payments to customers in connection with Your Transactions through Amazon. We will make any payments to customers in the manner we determine, and you will reimburse us for all amounts we pay.

. . .

**S-3.2.** If we inform you that we have received or initiated a claim under the "A-to-Z Guarantee" offered on a particular Amazon Site or other dispute relating to the offer, sale or fulfillment of Your Products (other than a chargeback), concerning one of Your Transactions, you will have 30 days to appeal our decision of the claim.

. . .

**F-8.2** We will be responsible for all customer service issues relating to packaging, handling and shipment, and customer returns, refunds, and adjustments related to Amazon Fulfillment Units. We will determine whether a customer will receive a refund, adjustment or replacement for any Amazon Fulfillment Unit and we will require you to reimburse us where we determine you have responsibility in accordance with the Agreement (including these FBA Service Terms and the Program Policies). We will promptly notify you when you are responsible for a customer refund. You may appeal if you disagree with our finding within thirty (30) days after our notification, in addition to your right to request that Units be returned to you under Section F-7.1. Except as provided in this Section F-8 regarding any Amazon Fulfillment Units, customer service will be handled in accordance with your Seller Agreement.

[Doc. 112-28, *Selling on Amazon Services*, § S-2.2, § S-3.2; *Fulfillment by Amazon Service Terms*, § F-8.2].

After conducting an independent review of the evidence submitted, this Court finds that Plaintiffs have presented sufficient summary judgment evidence to create a genuine dispute of material fact that Amazon not only "administers product

warranty obligations of the alien manufacturer" but may even *create* the warranty obligations *for* third-party seller/manufactures such as Jisell.  Stated differently, the express terms of the BSA provide substantial evidence that it is actually Amazon that creates the warranties and then contractually passes on the cost of such warranties to its third-party sellers.[19]

All told, while Amazon and its corporate representative point to their *Conditions of Use* and attest that they do not administer or pass on the warranties of third-party sellers when they accept product returns, the Court finds that Plaintiffs have the stronger position: "a jury can weigh this disclaimer against the commercial reality, but this disclaimer does not warrant summary judgment on this factor."  [Doc. 112-1, p. 20].[20]

### 3.   Did Amazon Prepare or Modify the Battery Charger for Distribution?

The third factor to consider for this inquiry is "whether the seller prepares or modifies the product for distribution."  La. R.S. § 9:2800.53(1)(d).  Another court in this district has determined that this factor requires the seller to take "some final step in readying the finished product" for distribution.  *Stone Energy Corp. v. Nippon*

---

[19]    *See Wall v. Am. Prod. Co.*, 2006 WL 3436059, at *3 (W.D. La. Nov. 27, 2006) ("Further, information in the Owner's Manual, namely warranty information and the order form for replacement parts and accessories, supports the fact that APC was the alter ego of the alien manufacturer.").

[20]    The Court notes that Amazon's reliance on *Skaggs*, 334 So. 3d 780, is misplaced.  As the Louisiana Supreme Court explained, *Skaggs* is "factually distinguishable" in several respects.  *Pickard, supra,* 387 So. 3d at 523.  Among other things, it is unclear in the *Skaggs* case whether evidence was presented in the trial court with respect to Amazon's warranty obligations.

*Steel*, 475 F.Supp.3d 563, 570 (W.D. La. 2020) (Juneau, J.).  In *Stone*, the court found it was enough when a seller "inspected and 'bucked on' . . . pipe before it was sent" to the customer.  *Id.*

Here, it is undisputed that Amazon's physical interaction with the battery charger was limited to storing the pre-packaged battery charger in its warehouse, retrieving the battery charger from the warehouse when ordered, placing the product in a shipping container or applying a shipping label to the product's box, and delivering or arranging delivery of the product to the buyer.  [Doc. 109-11, ¶ 15].  The weight that these actions should be afforded in the alter ego analysis is properly reserved for the jury.

### 4.    Other Relevant Evidence

Finally, the Court addresses the "other relevant evidence" factor.  Here, the Court finds that at least one additional matter will be important for a jury to consider when deciding whether Amazon acted as the alter ego of Jisell – how the typical Amazon transaction looks from the viewpoint of the customer.  While this additional consideration echoes some of the analysis discussed above, it also speaks more broadly to whether a typical consumer might consider Amazon and its third-party seller/manufacturer to be one and the same or, *alter egos,* when making a purchase.

To start, the Court notes that Amazon is the largest e-commerce company in the world.[21]  Amazon's share of the U.S. e-commerce market was 37.8% in 2023 and

---

[21]    *See* Russell, *supra, Who Are the 10 Biggest Retailers in the World* (Amazon is "[t]he top online retailer globally with $213bn in revenue.").

is expected to rise by another 11.7% in 2024.[22]  While Amazon does not publish the exact number of orders it receives annually, in 2023 it sold over 4.5 billion items in the U.S. alone.  This translates to an average of over 12 million items sold per day, 8,600 goods per minute, and 143 products per second.  Amazon's average daily sales revenue is $1.6 billion.[23]  On the other side of these transactions are individual consumers that may not be fully aware of the origin of the products they are purchasing.  A visit to the Amazon website shows the experience from the perspective of the buyer:



[Doc. 112-38, p. 2];

[22]    *20 Amazon Statistics You Need to Know in 2024,* REPRICEREXPRESS (January 29, 2024), https://www.repricerexpress.com/amazon-statistics/.

[23]    Jacob Lauring, *14 Staggering Amazon Statistics You Need to Know in 2024: Daily Sales, Market Share, and More,* JUNGLESCOUT (June 4, 2024), https:// www. junglescout. com/ resources/articles/amazon-statistics-2024/.





[Doc. 109-4, p. 1].

This screenshot shows the Jisell battery at issue as it was sold on the Amazon website.  As can be seen, the entire presentation of the product to the consumer is controlled by Amazon.  First, the product appears on Amazon's website, [Doc. 103-13, p. 12], and the webpage used to purchase the product includes Amazon's "product promotions."  [Doc. 112-38, p. 2]; *see* [Doc. 103-13, p. 12].  Notably, the font size used to identify Jisell as the "seller" is small compared to the other words on the webpage.  All reviews visible to consumers on the website are Amazon customer reviews, [Doc. 112-38, p. 2], and Amazon's webpage includes the deadline for a return of the product *to Amazon*.  [Doc. 109-4, p. 1] ("Return window closed on Jan 31, 2020[.]").  Payment is made to Amazon, [Doc. 109-13, p. 26]; Amazon applies an Amazon shipping label, [Doc. 109-11, p. 6]; Amazon ships the product, *Id.*; and Amazon makes safety assurances, [Doc. 112-9].  If a consumer has an issue with the product he or she purchased, the consumer interfaces with Amazon to resolve the problem.  The Amazon shopper may even have an Amazon "app" on his or her phone, which keeps the Amazon shopper up to date on all aspects of the transaction, from payment to shipment to delivery.

And Amazon's administration of the return process on behalf of its third-party sellers, including alien manufacturers, is also important. Amazon's return policy creates the impression that Amazon is standing in the shoes of its third-party sellers and providing at least some assurance that its customers will receive a quality product. If they don't, no worries; Amazon will take the product back and return the customers' money. When viewed holistically, Amazon controls the entire experience of the consumer when purchasing a product from a third-party seller on its platform, including foreign manufacturers such as Jisell.

Nor can it be disputed that the average Amazon shopper often knows little to nothing about many foreign manufacturers, such as Jisell, when purchasing that company's products. On the other hand, the typical Amazon shopper is very familiar with Amazon and may rely on Amazon's reputation when choosing the products to purchase. The Court therefore finds that the typical buyer experience is a relevant factor that the jury may wish to consider in its alter ego analysis.

Finally, in determining the weight to give to each of these fact-intensive considerations and the proper application of the summary judgment standard, the Court also takes into account that Jisell is a foreign manufacturer based in Shang Hai, China. [Doc. 17, p. 9]. As discussed above, one of the purposes of the LPLA is to ensure that the consumer does not bear the loss when a foreign manufacturer is "not subject to service of process or is immune from enforcement of a judgment." Kennedy, *supra*, 49 LA. L. REV. at 575-76. Though there have been recent exceptions, it has long been the case that when plaintiffs bring "their U.S. money judgments"

abroad to China, "foreign judgments are rarely, if ever, enforced there."  Jason Hsu, *Judgment Unenforceability in China*, 19 FORDHAM J. CORP. & FIN. L. 201 (2013); *see also* Michael J. Meagher & Lucia Lian, *Chinese Law for Lao Wai A Survey of Chinese Law for American Business Lawyers*, 51 BOSTON B.J., 17, 19 (2007).[24]  Simply put, if Amazon is not answerable to the Plaintiffs for the damage caused by the Jisell battery charger, no one likely is.

Considering all of the foregoing, the Court finds that reasonable persons could draw different conclusions when applying the alter ego factors to the evidence in the record.  The Court is therefore precluded from determining whether Amazon acted as the alter ego of Jisell as a matter of law in the present case.  Accordingly, because: (i) the Court finds that Amazon was a "distributor" of the battery charger under the undisputed facts of this case; and (ii) there are significant issues of fact that must be weighed by a jury to determine whether Amazon operated as the "alter ego" of Jisell, summary judgment on Plaintiffs' LPLA claim is denied.[25]

---

[24]    "Chinese courts will not likely enforce the judgments of United States courts.  The United States and China have never been signatories to an international treaty calling for the recognition and enforcement of foreign court judgments and there is no other reciprocal obligation of U.S. and Chinese courts to enforce each other's judgments."  *Id.*

[25]    Even if Plaintiffs are able to establish at trial that Amazon is the alter ego of Jisell and therefore a "manufacturer," they must still prove the remaining elements of their LPLA claim at trial.  "To recover under the [LPLA], a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product, (2) that the claimant's damage was proximately caused by a characteristic of the product, (3) that this characteristic made the product unreasonably dangerous, and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else."  *Daigrepont v. Exxon Mobil Corp.*, 340 So. 3d 1018 (La. App. 1st Cir. 12/30/21), *amended on reh'g,* (La. App. 1st Cir. 2022), *writ denied sub nom.,* 347 So. 3d 151 (La. 2022).

## II.    Non-Manufacturing Seller Liability

Plaintiffs also argue that Amazon is liable as a non-manufacturing seller.  To succeed on this claim, Plaintiffs must prove: (i) that Amazon is a seller, and (ii) that Amazon had "actual or constructive knowledge that the product was defective, and that the seller failed to declare the defect."  *Alexander v. Toyota Motor Sales, U.S.A.,* 123 So. 3d 712, 714 (La. 2013); *Slaid v. Evergreen Indem., Ltd.*, 745 So. 2d 793, 799 (La. App. 2d Cir. 1999).

### A.    Is Amazon a "Seller" for Purposes of Liability Under Article 2315?

The parties dispute whether the Louisiana Supreme Court's interpretation of the word "seller" as used in the LPLA is applicable to Plaintiffs' claim for non-manufacturer seller liability, with Plaintiffs arguing for a broad interpretation of the word and Amazon arguing for a more restrictive interpretation.[26]  The Court finds that the term should be construed in accordance with the Sales Title of the Louisiana Civil Code.

Generally, the articles of the Civil Code are part of a "complete system and must be construed with reference to each other and harmonized with its general purpose." *Udomeh v. Joseph*, 103 So. 3d 343, 347 (La. 2012).  Here, the "Sales" Title of the Louisiana Civil Code and Plaintiffs' claims against Amazon as a "non-

---

[26]    The Court notes that at the time it certified questions to the Louisiana Supreme Court, *Skaggs* was the most applicable Louisiana case discussing the definition of "seller" under both a non-manufacturer seller claim and the LPLA. 334 So. 3d 780 (La. App. 1st Cir. 2021).  However, the Louisiana Supreme Court has now weighed in on the issue. *Pickard*, 387 So. 3d 515.

manufacturing seller" (brought pursuant to La. Civil Code art. 2315) share a common purpose and apply to the same class of persons, *i.e.*, those who transfer a thing to another for a price.[27]  Thus, in defining "seller" for this tort claim, it is proper to construe the definition of "seller" *in pari materia* with the Sales Title of the Civil Code.  *See also Succession of Brandt*, 362 So. 3d 670 (La. App. 5th Cir. 2021), *aff'd*, 346 So. 3d 765 (La. 2022) (articles involving the same subject matter are presumed to be enacted in light of each other).  This conclusion is further supported by the Louisiana Supreme Court's emphasis in *Pickard* that its interpretation of the word "seller" was limited to the LPLA, which includes its own statutory definition. La. R.S. 9:2800.53(2). The court, however, "express[ed] no opinion whether the operator of an online marketplace is a seller in any other context."  *Pickard*, 378 So. 3d at 523.[28]

Under the Civil Code, a sale is "a contract whereby a person transfers *ownership* of a thing to another for a price in money."  La Civ. Code art. 2439 (emphasis added).  This transfer of ownership occurs "as soon as there is agreement as to the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid." La. Civ Code art 2456.  Importantly, the law of sales specifically

---

[27]    The articles within the "Sales" Title of the Louisiana Civil Code share the purpose of codifying the law as it relates to those transferring "ownership of a thing to another for a price in money." La. Civ. Code art. 2439.  But notably, these Civil Code articles and the LPLA "do not relate to the same class of persons or things, or share a common purpose."  *See Pickard*, 387 So. 3d at 521.

[28]    The Court's conclusion is further supported by the Louisiana Supreme Court's rationale behind defining "seller" broadly under the LPLA.  Under the LPLA, sellers are only liable where they are found to be "de facto manufacturers," rendering a broad definition of "seller" appropriate.  *Pickard*, 378 So. 3d at 523.  In contrast, the threshold question for Plaintiffs' non-manufacturing seller claim is simply whether the defendant is a "seller."

states that one cannot sell something that he does not own.  *See* La. Civ. Code art. 2452.[29]  Therefore, in reading the definition of a seller for this tort claim *in pari materia* with the Sales Title of the Civil Code, a "seller" must have ownership of the item to be sold.

Here, it is undisputed that Amazon never had ownership of the battery charger.  [Doc. 112-1, p. 10].  Thus, Amazon does not meet the definition of "seller" from the Sales Title of the Civil Code, meaning it is a not a "seller" for purposes of Plaintiffs' non-manufacturer seller tort claim.  Summary judgment in favor of Amazon on this claim is therefore appropriate.

## III.  Negligent Undertaking

Finally, Amazon seeks summary dismissal of Plaintiffs' negligent undertaking claim based on Amazon's alleged assumption of a duty.  *Pickard*, 387 So. 3d at 524, *citing Bujol v. Entergy Servs., Inc.*, *supra*, 922 So. 2d at 1128-29.  As made clear by the Louisiana Supreme Court in this case, one who does not owe a duty to act may assume such a duty by acting.  *Pickard*, 387 So. 3d at 524, *citing Hebert v. Rapides Parish Police Jury*, 974 So. 2d 635, 643 (La. 2007), *on reh'g* (La. 2008).  In *Pickard*, the court explained that although the Louisiana legislature has not created a specific cause of action for assumption of a duty, Section 324A of the Restatement of Torts Second applies to determine if an operator of an online marketplace assumed a duty owed by a third-party seller and is liable for any damages caused by the breach of

---

[29]    "The sale of a thing belonging to another does not convey ownership."  La. Civ. Code art. 2452.

that duty.  387 So. 3d at 526, *citing Bujol*, 922 So. 2d at 1128-29.[30]  The analysis of this claim is divided into two steps.  The first determination is whether a defendant assumed a duty.  The defendant assumes a duty under Section 324A when undertaking the rendition of services to another, which the defendant should recognize as necessary for the protection of a third person.  *Pickard*, 387 So. 3d at 524-25, *citing Bujol*, 922 So. 2d at 1129.  An affirmative or positive undertaking is required, and courts should consider the scope of the defendant's involvement, the extent of defendant's authority, and defendant's underlying intent.  *Bujol*, 922 So. 2d at 1131.  Mere concern or minimal contact about safety matters is not sufficient to constitute an assumption of a duty.  *Id.*  Superior knowledge and expertise regarding safety issues will not create a duty to guarantee safety.  *Id.* at 1133.

If a plaintiff can establish that the defendant assumed a duty and failed to exercise reasonable care in performance of the duty, the plaintiff must then prove one of the following: (a) defendant's failure to exercise reasonable care increased the risk

---

[30]    Section 324A provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
  (a)    his failure to exercise reasonable care increases the risk of such harm, or
  (b)    he has undertaken to perform a duty owed by the other to the third person, or
  (c)    the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (Am. Law Inst. 1965).

of harm to plaintiff, (b) defendant undertook to perform a duty owed by another to plaintiff, or (c) plaintiff's harm was suffered because plaintiff or the person who originally had the duty relied on defendant to perform the duty." *Pickard*, 387 So. 3d at 527, *citing Bujol*, 922 So. 2d at 1129. Here, Plaintiffs assert reliance under Section 324A(c), which requires that "the harm be suffered because of reliance by the plaintiff . . . on defendant's undertaking to perform the duty." *Id.* at 525, *citing Bujol*, 922 So. 2d at 1136. "Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." *Hill v. United States Fid. & Guar. Co.*, 428 F.2d 112, 113 (5th Cir. 1970), *citing* Restatement (Second) of Torts § 324A cmt. E.

In its Motion, Amazon argues that even if it assumed a duty, Plaintiffs cannot establish reliance because "they can offer no evidence that [Mr.] Pickard was even aware of, let alone made purchasing decisions based on, Amazon's purported 'promises to oversee safety.'" [Doc. 109-1, p. 25]. In support of this argument, Amazon cites the *Conditions of Use*, which states that Amazon is "not responsible for examining or evaluating, and we do not warrant, the offerings of any of these businesses or individuals (including the content of their Websites). Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties." [Doc. 109-14, p. 5].

Plaintiffs counter by proffering an Amazon blog post on its Amazon Seller Central page, wherein Amazon proclaims that "[c]ustomer safety is of paramount

importance to Amazon." [Doc. 112-16, p. 2]. Plaintiffs also point to the deposition testimony of John Horn, Amazon's Manager of Safety Controls for Product Safety and Compliance, regarding general consumer reliance on Amazon. When asked if he "believe[d] that Amazon expects their customers [to] rely upon [the] representation that Amazon is going to use sophisticated tools to prevent noncompliant products from being listed on its website," Mr. Horn answered, "It's my opinion that is correct." [Doc. 112-14, p. 11]. Finally, Plaintiffs present the affidavit of Angela Pickard, Mr. Pickard's daughter, in which she characterizes her father as a "conscientious shopper" and states that he "made an effort to make purchases from sources he trusted, such as Amazon's website, rather than from stores or other websites because Amazon told its customers, like my dad, that the products sold on its website were safe and met safety standards." *See* [Doc. 112-15, pp. 2-3, Affidavit of Angela Pickard].

Here, it is undisputed that Amazon had no safety complaints in connection with the battery charger that Mr. Pickard purchased. And, more importantly, Plaintiffs have failed to offer any summary judgment evidence that Mr. Pickard actually relied upon any promises or assurances made by Amazon about its product safety practices when deciding to purchase the subject Jisell battery charger. Nor is Mr. Pickard's daughter's affidavit alone sufficient to create a genuine dispute of fact regarding this specific transaction. *See* Restatement (Second) of Torts § 324A cmt. E. This alone is fatal to Plaintiffs' negligent undertaking claim, regardless of whether

Amazon assumed a duty. Thus, summary judgment in favor of Amazon on this claim is appropriate.

CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that the MOTION FOR SUMMARY JUDGMENT [Doc. 109] is GRANTED IN PART and DENIED IN PART, as follows:

The Motion is GRANTED with respect to the Plaintiffs' tort-based claims of non-manufacturer seller liability and negligent undertaking. Accordingly, these claims are DISMISSED WITH PREJUDICE. In all other respects, Defendant's MOTION FOR SUMMARY JUDGMENT is DENIED.

THUS, DONE AND SIGNED in Chambers on this 25th day of November 2024.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE